**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **NATIONAL CINEMEDIA, LLC,** | § | **Case No. 23-90291 (MI)** |
| | § | |
| **Reorganized Debtor.[1]** | § | |
| | § | |

**REORGANIZED DEBTOR'S**
**OBJECTION TO CLAIM NOS. 67, 68, & 69 FILED BY**
**MB KINETOPLAY, LLC, ERIC LAVANCHY, AND LAURENCE TOBIN**

**THIS IS AN OBJECTION TO YOUR CLAIM. THIS OBJECTION ASKS THE COURT TO DISALLOW THE CLAIM THAT YOU FILED IN THIS BANKRUPTCY CASE. IF YOU DO NOT FILE A RESPONSE WITHIN 30 DAYS AFTER THE OBJECTION WAS SERVED ON YOU, YOUR CLAIM MAY BE DISALLOWED WITHOUT A HEARING.**

**To the Honorable Marvin Isgur,**
**United States Bankruptcy Judge:**

National CineMedia, LLC, as the Reorganized Debtor ("NCM"), files this *Reorganized Debtor's Objection to Claim Nos. 67, 68, & 69 Filed by MB Kinetoplay, LLC, Eric LaVanchy, and Laurence Tobin* (the "Objection") pursuant to sections 105(a) and 502(a) and (b) of title 11 of the United States Code §§ 101 *et seq.* (the "Bankruptcy Code"), Rules 3001, 3007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Rule 3007-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules"), and the Procedures for Complex Cases in the Southern District of Texas (the "Complex Case Procedures"). NCM respectfully represents as follows in support of this Objection and submits the *Declaration of Laura Anne Kenwick in Support of the Reorganized Debtor's Objection to Claim Nos. 67, 68, &*

---

[1] The Reorganized Debtor's address is 6300 South Syracuse Way, Suite 300, Centennial, Colorado 80111. The last four digits of the Reorganized Debtor's taxpayer identification number are 2505.

*69 Filed by MB Kinetoplay, LLC, Eric LaVanchy, and Laurence Tobin*, attached hereto as **Exhibit A** (the "Kenwick Declaration"), and the *Declaration of Jerome Canning in Support of the Reorganized Debtor's Objection to Claim Nos. 67, 68, & 69 Filed by MB Kinetoplay, LLC, Eric LaVanchy, and Laurence Tobin*, attached hereto as **Exhibit B** (the "Canning Declaration").

## SUMMARY OF OBJECTION

1.      NCM objects to proofs of claim nos. 67, 68, and 69 (the "Claims") filed by MB Kinetoplay, LLC, Eric LaVanchy, and Laurence Tobin, respectively (each, a "Claimant," and together, the "Claimants"), which are based on unliquidated claims asserted in a Colorado state court lawsuit filed by the Claimants against NCM.[2] In that lawsuit, the Claimants sued NCM under four theories: (1) Breach of Contract; (2) Breach of Duty of Good Faith; (3) Civil Theft; (4) Violation of Colorado Wage Claim Act (the "CWCA Claims"). Only LaVanchy and Tobin asserted the CWCA Claims.

2.      NCM's core business is selling advertisements to be placed on the "big screen" or in the lobbies of movie theaters, such sales being business-to-business transactions. As a small supplement to that core business, NCM also markets various digital products for which NCM buys third-party advertising inventory, resells that inventory to corporate clients, and places the clients' advertisements where they will generate "impressions," which is the measure of how many viewers see an advertisement. A very small subset of NCM's digital products includes "digital gaming products," which are marketed to consumers and allow NCM to sell sponsorships of a game, sell advertising within the game to businesses, and sell virtual goods and merchandise directly related to the game. The Claims arise from a dispute about the digital gaming products.

---

[2]     See *MB Kinetoplay, LLC, Eric LaVanchy, and Laurence Tobin v. National CineMedia, LLC*, Case No. 2022CV31341, in the District Court, City and County of Denver, Colorado (the "State Court Suit").

3.     The Colorado state court granted NCM's motion to dismiss the claims in part, denying the Claimants' allegations of breach of duty of good faith and the CWCA Claims. The Claimants filed general unsecured claims for the remaining two actions: breach of contract and civil theft. *See* Addendum to Proof of Claim No. 68 ("Tobin alleges that the Debtor breached the Employment Agreement and committed civil theft under Colorado law when it failed to pay the bonus . . . ."); Addendum to Proof of Claim No. 69 (same for LaVanchy); Addendum to Proof of Claim No. 67 (same for MB Kinetoplay except that it is for breach of consulting agreement).

4.     Both the breach of contract and civil theft claims are premised on NCM's digital gaming products meeting certain revenue thresholds. The digital gaming products' revenue never reached the applicable thresholds, and the Court should disallow the Claims. The Court should reject the Claimants' attempt to expand the contracts' definition and revenue base to include all revenues earned on any product with a digital component and to include revenues earned by NCM's core in-theater products.

5.     The Claimants' claims for civil theft fail for the additional reason that NCM accurately allocated revenue to NCM's digital products, digital gaming products, and non-digital products using standard accounting processes that were approved by NCM's internal and external auditors to create accounting statements in the ordinary course of business. Because Claimants did not have a proprietary interest in the Performance Bonuses (as defined below) and NCM did not deceive the Claimants, the Court should deny the Claimants' claims for civil theft.

6.     NCM therefore seeks entry of an order disallowing the Claims in their entirety.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This Objection is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). NCM confirms its consent, pursuant to Bankruptcy Rule 7008, to the entry of a final order.

3

15099645

8.      Venue is proper pursuant to 28 U.S.C. § 1408.

9.      The bases for the relief requested in this objection are sections 105(a) and 502(a) and (b) of the Bankruptcy Code, Bankruptcy Rules 3001, 3007, and 9014, Bankruptcy Local Rule 3007-1, and the Complex Case Procedures. Pursuant to NCM's *First Amended Chapter 11 Plan* on April 26, 2023 [Docket No. 249] (the "Plan") and the Court's *Order (I) Approving the Debtor's Disclosure Statement on a Final Basis and (II) Confirming the Modified First Amended Chapter 11 Plan of Reorganization of National CineMedia, LLC* June 27, 2023 [Docket No. 457], this Court retained jurisdiction over claim objections.

## FACTUAL BACKGROUND

### The Agreements and the Performance Under the Agreements

10.     The Claimants formed Kinetoplay Inc. (the "Seller") in 2015 to create and manage online and mobile applications of cinema-related gaming. Complaint, ¶¶ 25–27.

11.     Under the various agreements described below, in 2017, NCM bought Seller's digital gaming business and brought on LaVanchy and Tobin as employees and MB Kinetoplay as a consultant to help manage and promote NCM's digital gaming pillar through various media outlets.

12.     On May 16, 2017, NCM entered into an Asset Purchase Agreement, by and among NCM, Seller, MB Kinetoplay, Sly Trunk LLC, and Monarch Jarvis LLC, for the purchase of substantially all of the assets of Seller (the "APA").[3]

13.     Seller, Sly Trunk, and Monarch Jarvis did not file a claim in this bankruptcy case or join the Claimants in their state court suit.

---

[3]   MB Kinetoplay, a Connecticut limited liability company, Sly Trunk, a California limited liability company, and Monarch Jarvis, a California limited liability company, owned all of the capital stock of Seller. APA, Recital B.

14.     The APA defined "Business" as Kinetoplay Inc.'s "business of creating and developing, commercializing and managing online/mobile application of movie and cinema-related entertainment *gaming* and content business for consumer engagement and use." APA, Recital A (emphasis added). With certain exceptions not in dispute here, the APA provided for NCM's purchase of assets involved in that Business.[4]

15.     A "Side Letter" was signed by NCM and Seller on May 16, 2017, regarding NCM's funding of the post-acquisition Business to promote NCM's digital gaming pillar (the "Side Letter"). The Side Letter provided that during the four-year period following the closing, NCM would promote and fund the operation of the digital gaming pillar by contributing $30 million worth of media value,[5] and $2.1 million in cash and qualified expenses to be used in the digital gaming pillar's operating budget. These contributions by NCM were in addition to the price paid to Seller and the yearly compensation and perks to the Claimants (described below).

16.     NCM spent and contributed more than the amounts set forth in the Side Letter. As of March 2019, NCM had spent more than $2.3 million in cash and qualified expenses. Kenwick Declaration, ¶ 4. By the end of 2019, NCM had contributed more than $30 million worth of media value. *See* Kenwick Declaration, ¶ 4. Because NCM had satisfied these obligations, NCM stopped tracking the amounts required under the Side Letter. Kenwick Declaration, ¶ 4.

17.     On July 14, 2017, LaVanchy and Tobin entered into employment agreements with NCM (the "Employment Agreements"). *See* Employment Agreements. NCM and MB Kinetoplay entered into a consulting agreement on July 14, 2017, which contained similar relevant provisions

---

[4]     After the purchase of the "Business", the Business became part of NCM's digital gaming pillar, and so the revenue relevant for the Performance Bonuses is that of NCM's digital gaming pillar. *See* Side Letter. For the purposes of this Objection, NCM includes all revenue from the digital gaming pillar, even for gaming products that were not part of the "Business" or that NCM owned and operated before the APA.

[5]     The media value consisted of advertisements within NCM's preshow, valued utilizing actual impressions delivered and rate card pricing. *See* Kenwick Declaration, ¶ 4.

as the Employment Agreements (the "<u>Consulting Agreement,</u>" and together with the APA,

Employment Agreements, Separation Agreements (as defined below), and Side Letter, the

"<u>Agreements</u>"). *See* Consulting Agreement; *compare* Consulting Agreement § 4.3.1 *with*

Employment Agreements, § 3(c).

18.     Under the Employment Agreements, LaVanchy and Tobin were to earn a base

salary of $87,500 for the first year of their employment with NCM, which amount increased

through the fourth year of their employment to $160,000. Employment Agreements, § 3(a). This

was in addition to the other usual employee benefits offered by NCM. *Id.,* § 3(b).

19.     LaVanchy and Tobin also had the chance to earn a "Business Performance Bonus"

(the "<u>Employee Performance Bonuses</u>") in the event the digital gaming products achieved certain

financial metrics:

> In the event that the Business (as defined in the [APA]) achieves Five Million
> Dollars ($5,000,000) in revenue ***directly generated by the Business's digital gaming
> products*** in the Company's [NCM's] digital gaming pillar through advertising,
> sponsorship, tournaments, virtual goods and merchandise ***directly purchased*** from the
> Company's digital gaming pillar from the Company's website or revenue share generated
> through the purchase from an affiliate of the Company or partner site of the Company, and
> others as mutually agreed upon by the Company and the Employee (collectively "<u>Digital
> Gaming Revenue</u>") in the twelve (12) months prior to the third (3rd) anniversary of the
> date hereof (the "<u>Third Year Revenue</u>"), the Company shall pay [the Third Year Bonus.]
> In the event that the Business achieves Seven Million Five Hundred Thousand Dollars
> ($7,500,000) in Digital Gaming Revenue in the twelve (12) months prior to the fourth (4th)
> anniversary of the date hereof (the "<u>Fourth Year Revenue</u>"), the Company shall pay [the
> Fourth Year Bonus.]

Employment Agreements, § 3(c) (emphasis added).

20.     Under the Consulting Agreement, MB Kinetoplay was to earn $60,000 for the first

year of the Consulting Agreement, which amount increased through the fourth year of the

Consulting Agreement to $120,000. Consulting Agreement, § 4 and Exhibit A. This was in

addition to other benefits and perks offered by NCM. *Id*. Similarly to the Employment Agreements,

the Consulting Agreement provided for a "Business Performance Bonus" (the "Consultant Performance Bonus," and along with the Employee Performance Bonuses, the "Performance Bonuses") in the event the digital gaming products generated certain revenue amounts. *Id.* § 4.3. The Consulting Agreement contained language similar to the Employment Agreements, although the potential bonus amount was larger than that possible under the Employment Agreements:

> In the event that the Business (as defined in the [APA]) achieves at least Five Million Dollars ($5,000,000) in revenue ***directly generated by the Business's digital gaming products*** in the Company's [NCM's] digital gaming pillar through advertising, sponsorship, tournaments, virtual goods and merchandise ***directly purchased*** from the Company's digital gaming pillar from the Company's website or revenue share generated through the purchase from an affiliate of the Company or partner site of the Company, and others as mutually agreed upon by the Company and the Consultant (collectively "Digital Gaming Revenue") in the twelve (12) months prior to the third (3rd) anniversary of the date hereof (the "Third Year Revenue"), the Company shall pay [the Third Year Bonus.] In the event that the Business achieves at least Seven Million Five Hundred Thousand Dollars ($7,500,000) in Digital Gaming Revenue in the twelve (12) months prior to the fourth (4th) anniversary of the date hereof (the "Fourth Year Revenue"), the Company shall pay [the Fourth Year Bonus.]

Consulting Agreement, § 4.3.1 (emphasis added).

21.     The relevant time periods for the Employee Performance Bonuses were July 14, 2019 through November 28, 2020 (the "Employee Third Year Bonus Period"), and November 29, 2020 through November 28, 2021 (the "Employee Fourth Year Bonus Period," and together with the Employee Third Year Bonus Period, the "Employee Bonus Periods").[6] *See* Kenwick Declaration, ¶ 7. The relevant time periods for the Consultant Performance Bonus were July 14, 2019 through July 13, 2020 (the "Consultant Third Year Bonus Period"), and July 14, 2020

---

[6]     As part of a reduction in force due to COVID-19's impact on NCM and in light of the poor performance of the digital gaming pillar and the associated low revenues, NCM entered into Separation and Release Agreements between itself and each of LaVanchy and Tobin, effective October 6, 2020 (the "Separation Agreements"). As a courtesy, NCM extended the Employee Third Year Bonus Period through November 28, 2020, and so the Employee Fourth Year Bonus Period went from November 29, 2020 through November 28, 2021. There was no such extension for the Consultant Third Year Bonus Period. The Separation Agreements did not release claims for the Employee Performance Bonuses, should any be earned. *See* Kenwick Declaration, ¶ 7.

through July 13, 2021 (the "<u>Consultant Fourth Year Bonus Period,</u>" and together with the Consultant Third Year Bonus Period, the "<u>Consultant Bonus Periods</u>").[7]

22.     The Claims depend on NCM's digital gaming pillar hitting the identified revenue thresholds. The digital gaming pillar's products are mostly consumer-facing, whereas NCM's core business is at the enterprise, or business-to-business, level. Canning Declaration, ¶ 7. NCM's digital gaming pillar provides digital gaming products for consumers to play on stand-alone websites or phone apps outside the theater or while waiting for the trailers to start as prompted by on-screen advertisements. Canning Declaration, ¶ 7. The digital gaming products are ad-supported with the sales of sponsorship of a game, advertising opportunities within a game, and potentially, virtual goods and merchandise directly related to the digital games. Canning Declaration, ¶ 7. During the Bonus Periods, NCM's overall sales strategy included offering advertisers in-theater advertising products (which includes on-screen and lobby advertising), digital advertising products, and gaming advertising products. Canning Declaration, ¶ 7. Advertisers would select which advertising products to include in a campaign, with the on-screen advertising being the core of NCM's business. Canning Declaration, ¶ 7. By way of example, in 2019, NCM ran a campaign with BallPark Franks, in which an advertisement for BallPark Franks was shown on the pre-show big screen. Canning Declaration, ¶ 7. After the advertisement was displayed, attendees in the theater were given an opportunity to participate in an augmented reality experience, in which they used their phones to interact with the big screen and trigger a race in which they controlled hot dogs racing around a virtual track. Canning Declaration, ¶ 7. The augmented reality experience,

---

[7]     For the sake of simplicity, and because the relevant thresholds necessary to earn the Performances Bonuses were not reached even under the extended periods provided to LaVanchy and Tobin, the Employee Bonus Periods and the Consultant Bonus Periods are referred to as the "Bonus Periods" unless specificity is otherwise required (e.g., for explanation of exact revenue earned over each period). NCM reserves all rights to challenge the amount of any Performance Bonus, should the Court find that any Performance Bonus was earned.

15099645

the hot dog race, was an example of how NCM used the big screen to integrate technology developed by NCM in its digital gaming pillar. Canning Declaration, ¶ 7. This was one of the limited examples in which NCM was able to generate revenue via the digital gaming pillar. Canning Declaration, ¶ 7.

23.    Prior to the acquisition of the Business, NCM had other digital products that were separate and apart from the digital gaming pillar. *See* Canning Declaration, ¶ 4. These digital products remained separate and apart from the digital gaming pillar throughout the Bonus Periods. *See* Canning Declaration, ¶ 4.

24.    One of those digital products is NCM's Cinema Accelerator (now referred to as Noovie Audience Accelerator), which was launched in 2015 and through which NCM sells digital (online and mobile) advertising to clients (the "Accelerator Digital Product"). Through the Accelerator Digital Product, NCM provides contractual guarantees to deliver a specified number of advertising impressions of the advertiser's content. The digital inventory on which these advertising impressions are displayed is purchased by NCM through advertising exchanges to meet the advertiser's target audience and scale. NCM purchases this third-party digital inventory because NCM does not generate a material, scaled volume of inventory on its owned and operated products. Canning Declaration, ¶ 5. The Claimants were never a part of the team responsible for the Accelerator Digital Product. Canning Declaration, ¶ 5.

25.    The Accelerator Digital Product generated revenue of $8,127,960 in 2016, the year before the Agreements, and revenues of $10,762,677 in 2017, $11,492,585 in 2018, $12,638,671 in 2019, $13,358,195 in 2020, and $11,585,032 in 2021. *See* Kenwick Declaration, ¶ 13.

26.    Another separate digital product is NCM's Digital Out-of-Home ("DOOH"), for which the sales group began selling DOOH media inventory in October of 2020 (the "DOOH

15099645

Product"). Through the DOOH Product, NCM sells advertisements that are placed on devices or screens in restaurants, on ATMs, and on college campuses. Canning Declaration, ¶ 6. The Claimants were never a part of the team responsible for the DOOH Product. Canning Declaration, ¶ 6.

27.    The DOOH Product generated revenues of $0 in 2020 and $2,239,157 in 2021. *See* Kenwick Declaration, ¶ 13.

28.    Revenue related to either the Accelerator Digital Product or the DOOH Product is not digital gaming pillar revenue and therefore was not included in the calculations of the Performance Bonuses. Kenwick Declaration, ¶ 13.

29.    The digital gaming pillar did not perform as NCM and the Claimants had hoped. Kenwick Declaration, ¶ 12. Digital gaming revenues were approximately $2,657 in 2017, the first year following the Agreements. Kenwick Declaration, ¶ 12. Digital gaming revenues increased to $286,557 in 2018 and $523,718 in 2019. Kenwick Declaration, ¶ 12. Unfortunately, the COVID-19 pandemic decimated the film and theater industries. Kenwick Declaration, ¶ 12. While the digital gaming revenues were $644,466 for the Consultant Third Year Bonus Period and $644,953 for the Employee Third Year Bonus Period, revenues steeply declined in the last year of the Performance Bonuses, and digital gaming revenues were $2,562.63 for the Consultant Fourth Year Bonus Period and $5,116.61 for the Employee Fourth Year Bonus Period. Kenwick Declaration, ¶ 12. This fall in digital gaming revenues coincided with industry-wide headwinds, with NCM's total revenue declining significantly over the same period. Kenwick Declaration, ¶ 12.

### The State Court Suit

30.    The Claimants filed their Amended Complaint (the "Complaint") on June 10, 2022. The Claimants sued NCM under four theories: (1) Breach of Contract; (2) Breach of Duty of Good

Faith; (3) Civil Theft; (4) Violation of Colorado Wage Claim Act. Only LaVanchy and Tobin asserted the CWCA Claims.

31.     NCM filed the *Defendant's Motion to Dismiss* (the "<u>MTD</u>") the state court claims on July 25, 2022, under the Colorado procedural rule for failure to state a claim. *See* Colorado Rule of Civil Procedure 12(b)(5).

32.     On March 24, 2023, the state court entered an *Order on Defendant's Motion to Dismiss* (the "<u>MTD Order</u>"), granting the MTD in part and dismissing the cause of action for breach of duty of good faith and the CWCA Claims. The MTD Order is attached hereto as **<u>Exhibit C</u>**.

33.     The MTD Order was the last substantive entry on the state court docket before NCM filed for bankruptcy protection.

### <u>The Chapter 11 Case</u>

34.     On April 11, 2023 (the "<u>Petition Date</u>"), NCM filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

35.     The Claimants filed their proofs of claim on May 30, 2023. Each Claimant asserts general unsecured claims for breach of contract and civil theft, but MB Kinetoplay's alleged damages are almost five times the amounts claimed by Tobin and LaVanchy: $15,108,000 for MB Kinetoplay vs. LaVanchy's and Tobin's $3,133,075 claims.

36.     The Court confirmed NCM's First Amended Chapter 11 Plan on June 27, 2023 [Docket No. 457]. The Plan went effective on August 7, 2023.

37.     NCM is operating its business and managing its property as a reorganized debtor.

### <u>OBJECTION</u>

38.     NCM seeks entry of an order disallowing the Claims in their entirety because the claims are unenforceable under any agreement or applicable law. Within this Objection, NCM

15099645

addresses the Claimants' remaining allegations from the State Court Suit and asserts that such allegations fail as a matter of law and fact. *See* 11 U.S.C. § 502(b)(1) ("such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law").

39.     Section 502 of the Bankruptcy Code deems the allowance of a claim or interest, proof of which is filed under section 501 of the Bankruptcy Code "unless a party in interest . . . objects." 11 U.S.C. § 502.

40.     A proof of claim loses the presumption of prima facie validity under Bankruptcy Rule 3001(f) if an objecting party refutes at least one of the allegations that are essential to the claim's legal sufficiency. *See In re Fidelity Holding Co., Ltd.*, 837 F.2d 696, 698 (5th Cir. 1988) ("If, however, evidence rebutting the claim is brought forth, then the claimant must produce additional evidence to prove the validity of the claim by a preponderance of the evidence.") (citation and internal quotation omitted); *see also In re Jack Kline Co., Inc.*, 440 B.R. 712, 742 (Bankr. S.D. Tex. 2010) ("A proof of claim is prima facie evidence of the pre-petition debt owed, and the burden is on the party challenging the allowance of the proof of claim to overcome the presumption."). Once such an allegation is refuted, the burden reverts to the claimant to prove the validity of its claim by a preponderance of the evidence. *Fidelity Holding*, 837 F.2d at 698. Thus, even with the burden-shifting framework, "the ultimate burden of proof always lies with the claimant." *In re Armstrong*, 347 B.R. 581, 583 (Bankr. N.D. Tex. 2006) (citing *Raleigh v. Ill. Dep't of Rev.*, 530 U.S. 15 (2000)).[8]

---

[8]     Pursuant to Bankruptcy Local Rule 3007-1(b) "[a]n objection to claim may be filed without a hearing date."

**The Agreements Provided for Performance Bonuses Based Only on Revenue Directly Generated by Digital Gaming Products**

41.    NCM objects to the Claims and seeks entry of an order disallowing them in their entirety because the Performance Bonuses were not earned.

42.    The Claimants, referencing their Complaint in the State Court Suit, argue that the digital gaming pillar reached the revenue necessary to trigger the Performance Bonuses and that NCM undercounted the relevant revenues. The Claimants' repeated references to "digital products" overstate the revenues earned by the digital gaming pillar to try to capture the unearned Performance Bonuses. *See, e.g.*, Complaint, ¶¶ 10, 53, 55–59. Applying the correct term from the Agreements—"digital **gaming** products"—the revenues fall short. *See* Employment Agreements, § 3(c) (emphasis added); Consulting Agreement, § 4.3.1 (emphasis added). The Claimants fail to acknowledge that NCM has unrelated digital products, including the Accelerator Digital Product and the DOOH Product, that generate revenue separate and apart from the digital gaming pillar, and that these revenues do not count towards the Performance Bonuses. *See* Canning Declaration, ¶¶ 4, 8; Kenwick Declaration, ¶ 13. Similarly, NCM's core on-screen product is not a part of the digital gaming pillar, and the on-screen product generates revenue separate from the digital gaming pillar. *See* Canning Declaration, ¶¶ 4, 8; Kenwick Declaration, ¶ 14. Thus, the revenue from the on-screen product does not count toward the Performance Bonuses, either.

43.    Because the Performance Bonuses were not earned, the Claimants cannot establish breach of the Agreements or civil theft. The claims are duplicative in that both are based on the same alleged withholding of the Performance Bonuses.

44.    As noted in the Employment Agreements and Consulting Agreement, the relevant revenue was that revenue "***directly generated by the Business's digital gaming products*** in the Company's [NCM's] digital gaming pillar through advertising, sponsorship, tournaments, virtual

goods and merchandise **directly purchased** from the Company's digital gaming pillar from the Company's website or revenue share generated through the purchase from an affiliate of the Company or partner site of the Company, and others as mutually agreed upon by the Company [and the Employee or Consultant] …." Employment Agreements, § 3(c) (emphasis added); Consulting Agreement, § 4.3.1 (emphasis added).

45.     Despite the limiting language of "directly generated," "digital gaming products," and "digital gaming pillar," the Claimants attempt to argue that they were responsible for some massive portion of NCM's total revenue during the Bonus Periods, a portion large enough to ensure the Claimants can claim the Performance Bonuses. *See* Complaint, ¶¶ 9–12, 59–60.

46.     In reality, NCM's total revenue was normal in the years following the Agreements, with the exception of 2020 and 2021, which were disrupted by the COVID-19 pandemic. *See* Kenwick Declaration, ¶ 6. NCM's total revenue in the year preceding the Agreements, 2016, was $447.6 million. For the years encompassed at least partially by the Agreements, NCM posted total revenues of $426.1 million for 2017, $441.4 million for 2018, $444.8 million for 2019, $90.4 million for 2020, and $114.6 million for 2021. *See* Kenwick Declaration, ¶ 11. If the Claimants were responsible for the large amounts they suggest, NCM should have seen some large increase in total revenue after the parties entered into the Agreements. Instead, NCM's total revenue was greatest in 2016—the year before the APA was signed.

47.     The Claimants fail to include in their Claims any calculation of revenue directly generated by the digital gaming pillar. Instead, Claimants conveniently omit "gaming" from the restrictive language in the Employment Agreements and Consulting Agreement, and cite to NCM statements relating to "digital products" and "digital components," many of which pertain to periods before the Bonus Periods, to then argue that "digital gaming products" were responsible

for some large portion of NCM's total revenue. *See, e.g.*, Complaint, ¶ 10 (referencing NCM's 2018 annual report, which noted that an increased percentage of advertising purchases had a "digital component" and that "digital products," including some digital gaming products, helped drive NCM's core on-screen advertising business).

48.   Digital gaming revenues were approximately $2,657 in 2017, and increased to $286,557 in 2018 and $523,718 in 2019. *See* Kenwick Declaration, ¶ 12. Unfortunately, the COVID-19 pandemic decimated the film and theater industries. *See* Kenwick Declaration, ¶ 12. While the digital gaming revenues were $644,466 for the Consultant Third Year Bonus Period and $644,953 for the Employee Third Year Bonus Period, revenues steeply declined in the last year of the Performance Bonuses, and digital gaming revenues were $2,562.63 for the Consultant Fourth Year Bonus Period and $5,116.61 for the Employee Fourth Year Bonus Period. *See* Kenwick Declaration, ¶ 12. This fall in digital gaming revenues coincided with industry-wide headwinds, with NCM's total revenue declining significantly over the same period. *See* Kenwick Declaration, ¶ 12.

49.   Further, NCM's other digital products are not included in the digital gaming pillar. One such product is NCM's Accelerator Digital Product, which generated revenues of $8,127,960 in 2016, the year before the Agreements, and revenues of $10,762,677 in 2017, $11,492,585 in 2018, $12,638,671 in 2019, $13,358,195 in 2020, and $11,585,032 in 2021. *See* Kenwick Declaration, ¶ 13. The DOOH Product, another digital product separate from the digital gaming pillar, generated revenues of $0 in 2020 and $2,239,157 in 2021. *See* Kenwick Declaration, ¶ 13.

50.   NCM did not sell any merchandise, virtual goods, or data sets relating to digital gaming products over the course of the Bonus Periods. Kenwick Declaration, ¶ 18.

51.     NCM properly prepared accounting statements (the "Accounting Statements") and provided these to the Claimants. Kenwick Declaration, ¶ 17. NCM created the Accounting Statements in the ordinary course of business by using NCM's standard accounting procedures, explained below, and the information underlying the Accounting Statements was subject to NCM's accounting audit. *See* Kenwick Declaration, ¶ 17. In accordance with those procedures, NCM properly attributed revenue, if any, to any digital gaming products included in contracts with NCM customers. Kenwick Declaration, ¶ 17.

52.     NCM uses a standard accounting process to attribute revenue across the various products that may be included in a single contract. Kenwick Declaration, ¶ 15. To account for the added value, and in accordance with Accounting Standards Codification 606 – Revenue from Contracts with Customers ("ASC 606"), NCM allocates revenue to each underlying performance obligation within a contract that has standalone value. Kenwick Declaration, ¶ 15. As part of this process, NCM has an annual key control under the Sarbanes-Oxley Act whereby it prepares a memo outlining all products that were included in contracts as added value and assigns a fair value to those products based upon the methods outlined within ASC 606 (i.e., either standalone selling value, competitor pricing, or cost-plus margin). Kenwick Declaration, ¶ 15. In the instance of digital gaming products, NCM utilized the standalone selling value, as there were no direct competitive pricing available or any incremental costs incurred to allow for the cost-plus margin method to be utilized. Kenwick Declaration, ¶ 15. NCM utilized the limited standalone sales of sponsorships in order to develop the fair value utilized to allocate revenue to digital gaming products when included in an opportunity at $0. As a key Sarbanes-Oxley control, this memo and process are reviewed by NCM's external auditor, Deloitte & Touche LLP, and internal auditor, and as pertains to the digital gaming pillar, each auditor deemed the memo and process to be

operating effectively. Kenwick Declaration, ¶ 15. Additionally, the underlying digital gaming pillar revenue was subject to NCM's external auditor's testing, and no issues were identified. Kenwick Declaration, ¶ 15. NCM follows ASC 606 for all of its revenue attributions, not just those for the digital gaming pillar. Kenwick Declaration, ¶ 16.

53.     Due to the digital gaming pillar's poor performance and the impact of COVID-19 on the theater business, NCM parted ways with LaVanchy and Tobin in October 2020, but permitted them to remain eligible for Performance Bonuses for the Employee Fourth Year Bonus Period, which began after their departure. Despite the lack of revenue being generated from the digital gaming pillar, NCM completed the terms of the Consulting Agreement, which expired according to its terms. Kenwick Declaration, ¶ 8.

54.     The Claims should be denied because the revenue directly generated by NCM's digital gaming pillar fell well short of the $5 million and $7.5 million thresholds required for the Performance Bonuses over the respective Bonus Periods. The Claimants, realizing that the thresholds have not been met, have resorted to desperate tactics to increase the scope of revenue potentially attributable to the digital gaming pillar in an effort to meet these thresholds. This Court should limit the scope of applicable revenue to the contractually agreed digital gaming pillar.

**The Claims for Civil Theft Must Fail for the Additional Reason that Claimants Cannot Prove Anything More Than a Creditor–Debtor Relationship**

55.     "To recover under the statute, the owner must prove that the taker committed acts constituting at least one of the statutory crimes of theft, robbery, or burglary." *Bermel v. BlueRadios, Inc.*, 440 P.3d 1150, 1156–57 (Colo. 2019). To show that the taker committed the crime of theft, "all of its statutory elements must be proved, including the two culpable mental states: (1) that the defendant knowingly obtained control over the owner's property without authorization and (2) that he or she did so with the specific intent to permanently deprive the owner

of the benefit of property." *Itin v. Ungar*, 17 P.3d 129, 134 (Colo. 2000) (citing C.R.S. § 18–4–401(1)).

56.     The Colorado Supreme Court has repeatedly held that the statutory definition of theft is not met where there is only a dispute between a debtor and a creditor over money owed. *See People v. Treat,* 568 P.2d 473, 477 (Colo. 1977); *People v. Rotello*, 754 P.2d 765, 767 (Colo. 1988). *Ortiz v. Cervantes*, No. 19-CV-30517, 2020 Colo. Dist. LEXIS 2567, at *8–9 (Colo. Dist. Ct. Aug. 4, 2020), applied these decisions to grant summary judgment on a civil theft claim for unpaid services, pointing out the distinction "between owing money to someone and taking money from someone." Only the latter is actionable as theft. *Id.*

57.     As stated, NCM created the Accounting Statements in the ordinary course of business by using NCM's standard accounting procedures, and the information underlying the Accounting Statements was subject to NCM's accounting audit. *See* Kenwick Declaration, ¶ 17. The Claimants have not shown otherwise; rather, they suggest that NCM "twisted its accounting" by failing to allocate revenue to the digital gaming pillar for bonus purposes. *See* Complaint, ¶¶ 81, 82, 99. And so any disagreement about NCM's accounting methods is a bona fide dispute between NCM and the Claimants on how to account for the standalone selling value of digital gaming products. The Claimants still not have shown that any Performance Bonus purportedly owed was their property. *See Kelley v. People*, 402 P.2d 934 (Colo. 1965).

58.     In *Kelley*, the Supreme Court of Colorado overturned an embezzlement verdict because the parties' arrangement "was clearly such that the relationship between them was that of debtor and creditor." 402 P.2d at 935. In that case, an operator contracted with a company to sell the company's gas. *Id.* The company retained title in the gas until the gas entered the customers' cars. *Id.* The operator set retail prices and kept the difference between the retail price and the price

he was to pay the company per gallon. *Id.* The court noted the importance of the fact that "the property alleged to have been embezzled here was not gasoline, the title to which remained in the Company until sale, but rather the money received by defendant for the gasoline." *Id.* It was also important to the court that the operator was not an agent or employee of the company, the operator ran the business independently from the company's oversight, the funds from the sale of gasoline were not held in trust for the company, and the company did not care how the operator generated the specific funds used to pay for the gasoline sales (for example, the operator could have paid the company with funds generated from sales of inside inventory). *Id.* For those reasons, "No money collected by [operator] in the operation of the station became the Company's property until it was actually transferred to the Company by [operator] in payment of his obligation. The arrangement between [operator] and the Company was clearly such that the relationship between them was that of debtor and creditor." *Id.*

59.     The present dispute is similar. NCM was not acting as an agent of the Claimants or Seller in interacting with NCM's clients. *See* Kenwick Declaration, ¶ 19. There is no provision in the Agreements that certain revenues were to be held in trust for the Claimants, or that any Performance Bonus earned was to be paid with revenues directly traceable to the digital gaming pillar. *See* Kenwick Declaration, ¶ 20. And the Claimants do not allege that NCM stole the actual digital gaming products (which NCM could not have stolen because NCM purchased those products through the APA).

60.     In another analogous situation, the Colorado Supreme Court held that there was an agreement between a victim and the defendant's company to share rents on a motor home that the victim had purchased from the defendant's company. *People v. Treat*, 568 P.2d at 577. The court found there was "[n]o evidence [] that the [defendant's company] was an agent for the purpose of

rental collections, or that specific rental funds were to be set aside for payment to [the victim]. [The victim's] only concern was that he be paid his share of the rents collected; no money collected by [defendant] became [the victim's] property until it was transferred by [defendant] in payment of the obligation. . . . This was simply a debtor-creditor controversy, properly to be resolved by civil proceedings." *Id.*

61.     The same is true here. NCM collected its own revenues, not on behalf of the Claimants, and there were no specific revenues to be set aside for payment to the Claimants in the event the Performance Bonuses were earned. *See* Kenwick Declaration, ¶¶ 19–20. Thus, just as in *Treat*, this situation is at most a debtor-creditor controversy.

62.     Alternatively, if the Court believes that this dispute is more than a debtor-creditor controversy, then the Claimants still have not shown and cannot show that NCM falsified the Accounting Statements, which, in addition to proving they had a proprietary interest in the Performance Bonuses, is necessary to succeed on their claims for civil theft: "(1) A person commits theft when he or she knowingly obtains, retains, or exercises control over anything of value of another without authorization or *by threat or deception*; . . . and: (a) Intends to deprive the other person permanently of the use or benefit of the thing of value . . . ." C.R.S. § 18-4-401 (emphasis added).

63.     For example, for a different theft count in *People v. Treat*, the court found that the requisite intent for theft could be inferred by the defendant's "use of the 'stall' to put [the victim] off until [the defendant] could leave the state, or from his payment with a worthless bank draft." 568 P.2d at 475. Here, the Claimants have not shown and cannot show that NCM knew that the Performance Bonuses were earned by the Claimants and yet still intended to deprive them of the Performance Bonuses permanently. *See* C.R.S. § 18-4-401; *see also* Kenwick Declaration, ¶ 26

20

15099645

("The Performance Bonuses were not earned by Claimants under the terms of the Agreement. . . .").

64.     As stated above, NCM properly prepared the Accounting Statements in the ordinary course of business by using NCM's standard accounting procedures, and the information underlying the Accounting Statements was subject to NCM's accounting audit. *See supra* ¶¶ 42–43; *see also* Kenwick Declaration, ¶¶ 15–17. The Performance Bonuses were not earned by the Claimants under the terms of the Agreements. NCM communicated that conclusion to the Claimants and timely delivered the Accounting Statements. *See* Kenwick Declaration, ¶21.

65.     The Claimants provide no relevant evidence to support their claims. Rather, they rely mostly on (1) pre-2020 NCM statements about digital products generally (which is a wider product suite than what qualifies for the Performance Bonuses); and (2) allegations of "personal knowledge that NCM has employed the Digital Gaming Products to generate revenue from specific large clients that is sufficient to satisfy the revenue thresholds . . . ." *See* Complaint, ¶ 61.

66.     As shown *supra*, the Agreements provide for Performance Bonuses if revenue ***directly generated from digital <u>gaming</u> products*** exceeded certain high thresholds. The Claimants' references to NCM statements about digital products (no "gaming") are irrelevant, as those statements deal with digital products that are separate from—and more profitable than—those covered by the Employee Agreements and the Consulting Agreement. *See* Canning Declaration, ¶¶ 4, 8–11 (describing how "digital products" differ from products in the digital gaming pillar); Kenwick Declaration, ¶¶ 12–13 (providing revenue amounts showing that non-gaming digital products were more profitable than the digital gaming pillar).

67.     The Claimants similarly attempt to broaden their bases beyond "directly generated" revenue to claim all the value of "big screen + digital" advertising campaigns. Complaint,

¶¶ 59-60. However, digital sales are primarily driven by non-gaming digital products such as the Accelerator Digital Product, which NCM offers in "big screen + digital" campaigns in an effort to connect the advertisers with digitally engaged moviegoers before and after the movie experience. Canning Declaration, ¶ 9. Overall, NCM's core on-screen business is the primary draw for advertisers and drives sales of any secondary digital products. Canning Declaration, ¶ 10. As part of its sales strategy, NCM pitches other products, such as the Accelerator Digital Product or a digital gaming product, to clients interested in on-screen advertising. Canning Declaration, ¶ 10. But despite NCM's efforts in marketing digital gaming products to NCM's customers, the digital gaming products have struggled to gain traction in the marketplace. *See* Canning Declaration, ¶ 11. In sum, NCM's on-screen advertising drives the sales of digital products or digital gaming products; The digital gaming pillar does not drive NCM's existing, core business. *See* Canning Declaration, ¶¶ 9–11.

68.     The Claimants' purported "personal knowledge" is similarly unavailing. Complaint, ¶ 61. That evidence can be reduced to say that NCM had contracts that involved the digital gaming pillar, and that those contracts were worth more than the thresholds needed to earn the Performance Bonuses. Again, the Claimants seek to capture value from all of NCM's sales— even that revenue from NCM's core on-screen business—regardless of how much revenue was actually generated by the digital gaming pillar.

69.     The Accounting Statements undermine the Claimants' twisting of NCM's statements about digital products and the Claimants' assertions as to the few contracts that involved digital gaming products. In accordance with ASC 606 and NCM's standard accounting procedures, the Accounting Statements allocated revenue to the various digital gaming products for the relevant time periods. Kenwick Declaration, ¶ 17. All advertising revenue was depressed

for this period as a result of the pandemic, and digital gaming revenue was no exception. *See* Kenwick Declaration, ¶¶ 6, 12.

70.     Because they cannot prove a claim for civil theft under Colorado law, the Claimants have no grounds for treble damages or attorney fees. C.R.S. § 18-4-405; *see also Itin v. Ungar*, 17 P.3d 129, 134 (Colo. 2000) ("Only upon proof of the criminal act of theft may the owner recover treble damages, fees, and costs.").

## NCM Should Recover Attorney Fees

71.     The APA, which is incorporated by the Employment Agreements and the Consulting Agreement, provides that "If any Legal Proceeding relating to this Agreement or the enforcement of any provision of this Agreement is brought against any party hereto, the prevailing party shall be entitled to recover reasonable attorneys' fees, costs and disbursements[.]" APA, § 11.2 ("Attorneys' Fees"). The Claimants themselves acknowledge that their claims relate to the APA. Complaint, ¶¶ 5–8.

72.     Regardless of the Claimants' acknowledgments, pursuant to merger clauses contained therein, the Consulting Agreement and Employment Agreements incorporate the terms of the APA—including its attorneys' fees provision. *See* Consulting Agreement § 4.3.1 (referring to the "Asset Purchase Agreement"), § 13.6 ("This Agreement, together with any exhibits and documents referred to herein, constitutes the entire agreement of the parties with respect to the subject matter hereof and supersede any and all prior or contemporaneous agreements."); Employment Agreements § 3(c) (referring to the "Asset Purchase Agreement"), § 12 ("This Agreement, those documents expressly referred to herein and other documents of even date herewith embody the complete agreement and understanding among the parties . . . .").

15099645

## **RESERVATION OF RIGHTS**

73.     NCM expressly reserves all rights related to this Objection, including, without limitation, the right to amend, modify, or supplement this Objection and/or raise any additional objections or arguments, prior to or during any hearing(s) regarding the claims, or any hearing regarding payment of any claims. NCM also reserves the right to object to any of the claims on any other grounds. All such rights are expressly reserved and preserved.

## **CONCLUSION**

WHEREFORE, NCM respectfully requests that this Court (i) disallow the Claims in their entirety, (ii) grant NCM attorney fees, and (iii) grant any further relief to which NCM may be justly entitled.

Dated: January 3, 2024
Houston, Texas

PORTER HEDGES LLP

By:  */s/ John F. Higgins*
John F. Higgins (TX 09597500)
Heather Hatfield (TX 24050730)
Jack Eiband (TX 24135185)
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Fax: (713) 226-6248
jhiggins@porterhedges.com
hhatfield@porterhedges.com
jeiband@porterhedges.com

*Counsel for the Reorganized Debtor*

15099645

### <u>Certificate of Service</u>

I certify that on January 3, 2024, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas and directed the noticing agent Omni Agent Solutions to serve the foregoing document on the Claimants.

*/s/ John F. Higgins*
John F. Higgins

15099645