**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| NATIONAL CINEMEDIA, LLC, | ) | Chapter 11 |
| | ) | |
| | ) | Case No. 23-90291 (MI) |
| | ) | |
| Debtor. | ) | |

---

**RESPONSE OF MB KINETOPLAY, LLC, ERIC LAVANCHY, AND LAURENCE
TOBIN TO REORGANIZED DEBTOR'S OBJECTION TO CLAIM NOS. 67, 68, & 69**

---

Creditors MB Kinetoplay, LLC (hereinafter "Matthew Berry" or "Berry"), Eric Lavanchy,

and Laurence Tobin (together, the "Kinetoplay Claimants") hereby respond to the January 3, 2024

Objection ("Objection" or "Obj.") filed by the Reorganized Debtor National Cinemedia LLC (the

"Debtor" or "NCM"), and in further support of their Claims state as follows.

### L.R. 9013-1 Certification

On January 12, 2024, counsel for the Kinetoplay Claimants conferred with counsel for NCM

concerning the NCM's objection and the parties were unable to resolve the matter.

### PRELIMINARY STATEMENT

In 2017, in furtherance of its attempt to transform for the digital age, NCM acquired the

business of the Kinetoplay Claimants, which was known as "Fantasy Movie League." At the time, it

was well understood among the parties – and reflected in public comments at the time and in

contemporaneous communications – that NCM would integrate numerous elements of Fantasy

Movie League into its forthcoming digital initiative, including advertising, sponsoring, and every

other facet of its business.

1

The primary compensation to the Kinetoplay Claimants was the promise of an earn-out bonus. To that end, the parties deliberately created broad language in the applicable agreements that would consider revenue generated from virtually every conceivable form of revenue that that NCM might receive over the ensuing four years that incorporated a digital gaming product. The reason was simple: the Debtor had virtually no digital assets prior to the acquisition, and the Kinetoplay Claimants brought expertise in building out digital products for other nationally recognized brands, along with a known product, and critical first party data. As reflected in the plain language of their respective contracts, the bonuses for the Kinetoplay Claimants were based on *all* revenue that incorporated a digital gaming product, including all revenue generated from advertising and sponsorship.

By NCM's admissions in its SEC filings (and to some extent even its Objection), NCM was able to leverage the value of the assets, data, and know-how from Fantasy Movie League into an astonishing success. According to those public filings, NCM's digital business (including products that incorporated a digital gaming product) was responsible for a substantial portion of the revenue both before and after COVID-related slowdowns. At a time when movie theaters were closed due to the pandemic, NCM was still able to sell digital products to advertisers – digital products that were derived from the assets, data, and know how that NCM had acquired from Fantasy Movie League in 2017.

Had the Debtor honored its agreements with the Kinetoplay Claimants, it would have paid out the maximum bonuses permitted under the respective agreements when they were due. The Kinetoplay Claimants are aware of specific advertising initiatives and promotions incorporating digital gaming products (including Noovie) that generated revenue more than sufficient to meet the dollar threshold for the maximum bonuses; they expect others to be identified through discovery.

2

However, NCM chose instead to withhold payment and provide fraudulent accounting statements that deliberately omitted key revenue metrics. In doing so, NCM asserted that it owed almost *nothing* for the Fantasy Movie League acquisition. NCM's actions not only violated the contract, they are also tantamount to civil theft. With respect to LaVanchy and Tobin, these actions also violated the California Wage Act.

While the Kinetoplay Claimants have not received a whit of discovery from NCM, it is not difficult to understand why NCM chose to prevaricate rather than act honestly in calculating the bonuses owed to the Kinetoplay Claimants. If NCM had admitted it owed the bonuses to the Kinetoplay Claimants, it likely would have been forced into a Chapter 11 restructuring long before it actually filed the Petition. If NCM had paid the bonuses owed to the Kinetoplay Claimants, it also may not have had the available cash to pay the handsome bonuses that its senior management received while the company was flailing and purportedly unable to make interest payments to its lenders. Whatever the reason, the Kinetoplay Claimants' claims should be honored and the Court award the full amount of claims.

NCM's objections to the claims are meritless, and indeed, continue its pattern of obfuscation and prevarication with respect to the Kinetoplay Claimants. For example, it has filed declarations from two employees who have no personal knowledge whatsoever of the discussions among the Parties during the negotiations over the language in their respective Agreements, and whose declarations contradict the public statements of NCM's senior management concerning the acquisition. Tellingly, certain senior members of management with *actual* knowledge of these discussions were available to NCM at the time it filed the Objection (including NCM's Chief Executive Officer and its Chief Digital Officer), yet NCM conspicuously chose not to submit their declarations with its Objection.

The Objection rests on a misnomer. It argues that the reference in the Employment Agreement and the Consulting Agreement to a "digital gaming pillar" is a stand-alone business, like a website or separate product line. That is not what the parties meant when they executed the agreement, as NCM well knows.

When NCM acquired Fantasy Movie League in 2017, NCM's stated intention was to develop three separate "pillars" for its new digital strategy – gaming, ticketing, and content. These three "pillars" were supposed to drive the generation of first party data and other digital assets that were sought by NCM's clients. The ticketing and content "pillars," however, quickly fell flat. The ticketing "pillar" was never launched after resistance from theaters. The content "pillar" has been negligible.

The only "pillar" that ultimately contributed to NCM's successful new digital strategy in 2017 was the digital gaming pillar, which was born when NCM acquired Fantasy Movie League, its executives, founders and tech team. Through the Fantasy Movie League acquisition, NCM obtained the first party data, know how, and assets of the Kinetoplay Claimants and their tech team (SlyTrunk), and integrated them across all of the digital products it offered to clients.

Thus, NCM's entire digital ecosystem is the "digital gaming pillar," as the parties used that phrase in the Employment Agreements and the Consulting Agreement. The "digital gaming pillar" is not a "supplement" to NCM's digital business, it is NCM's digital business. And as nearly every digital offering is derived from the assets acquired from Fantasy Movie League, those digital offerings are also nearly all "Digital Gaming Products" as that term is used in the relevant contracts.

The Kinetoplay Claimants look forward to finally obtaining discovery in this contested matter and to a hearing on the merits of their claims. However, any hearing should wait for the final resolution of the case that the Kinetoplay Claimants filed in California Superior Court against National Cinemedia, Inc., Thomas Lesinski, and Richard Butler. *See* Ex. 1 (the "California Action").

The Kinetoplay Claimants filed the California Action after opting out of the third party releases in the Plan, and after the Debtor successfully argued in Colorado that LaVanchy and Tobin's wage act claims are subject to California law. It would make little sense to decide state law claims in Bankruptcy Court when a state court is deciding those issues and its decision may be preclusive here.

## RESPONSE TO ALLEGATIONS IN OBJECTION

For the Court's convenience, the Kinetoplay Claimants present herein the allegations set forth in the Objection, and their response thereto pursuant to C.R.C.P. 7008. To the extent that an allegation in the Objection is not specifically admitted, it is denied.

1.       **NCM objects to proofs of claim nos. 67, 68, and 69 (the "Claims") filed by MB Kinetoplay, LLC, Eric LaVanchy, and Laurence Tobin, respectively (each, a "Claimant," and together, the "Claimants"), which are based on unliquidated claims asserted in a Colorado state court lawsuit filed by the Claimants against NCM. In that lawsuit, the Claimants sued NCM under four theories: (1) Breach of Contract; (2) Breach of Duty of Good Faith; (3) Civil Theft; (4) Violation of Colorado Wage Claim Act (the "CWCA Claims"). Only LaVanchy and Tobin asserted the CWCA Claims.**

**ANSWER:** The fact of NCM's objection is admitted, but the Objection itself is denied. The lawsuit and proofs of claim speak for themselves and the Kinetoplay Claimants deny the allegation to the extent that it mischaracterizes the claim and/or the lawsuit.

2. **NCM's core business is selling advertisements to be placed on the "big screen" or in the lobbies of movie theaters, such sales being business-to-business transactions. As a small supplement to that core business, NCM also markets various digital products for which NCM buys third-party advertising inventory, resells that inventory to corporate clients, and places the clients' advertisements where they will generate "impressions,"**

which is the measure of how many viewers see an advertisement. A very small subset of NCM's digital products includes **"digital gaming products,"** which are marketed to consumers and allow NCM to sell sponsorships of a game, sell advertising within the game to businesses, and sell virtual goods and merchandise directly related to the game. The Claims arise from a dispute about the digital gaming products.

**ANSWER:** Denied. This is a mischaracterization of NCM's business model, and in particular a mischaracterization of the dispute among the Parties. In fact, following the acquisition, NCM incorporated digital gaming products, and the data generated therefrom, and became a critical part of its business model. This dispute is not about a "small supplement" to the NCM business, but to the core advertising and sponsorship services it provided to clients during the time period at issue, many of which incorporated Digital Gaming Products.

**3. The Colorado state court granted NCM's motion to dismiss the claims in part, denying the Claimants' allegations of breach of duty of good faith and the CWCA Claims. The Claimants filed general unsecured claims for the remaining two actions: breach of contract and civil theft. See Addendum to Proof of Claim No. 68 ("Tobin alleges that the Debtor breached the Employment Agreement and committed civil theft under Colorado law when it failed to pay the bonus . . . ."); Addendum to Proof of Claim No. 69 (same for LaVanchy); Addendum to Proof of Claim No. 67 (same for MB Kinetoplay except that it is for breach of consulting agreement).**

**ANSWER:** Denied to the extent that it mischaracterizes the Colorado court decision, and also the proofs of claim. The Colorado state court denied NCM's attempt to dismiss the Kinetoplay Claimants' breach of contract and theft claims, and rejected many of the very arguments that NCM tries to raise again here. The Colorado state court only dismissed the Kinetoplay Claimants' wage act

claims because of the argument that the Colorado Wage Act did not apply to the claims of California residents LaVanchy and Tobin.  LaVanchy and Tobin have claims under the California Wage Act against NCM and also against the defendants in the California Action.

**4. Both the breach of contract and civil theft claims are premised on NCM's digital gaming products meeting certain revenue thresholds. The digital gaming products' revenue never reached the applicable thresholds, and the Court should disallow the Claims. The Court should reject the Claimants' attempt to expand the contracts' definition and revenue base to include all revenues earned on any product with a digital component and to include revenues earned by NCM's core in-theater products.**

**ANSWER:** Denied. This is a mischaracterization of the claims, a mischaracterization of the applicable contracts, and a false statement concerning the revenue that should have been allocated for the purposes of calculating the Kinetoplay Claimants' bonuses.

**5. The Claimants' claims for civil theft fail for the additional reason that NCM accurately allocated revenue to NCM's digital products, digital gaming products, and non-digital products using standard accounting processes that were approved by NCM's internal and external auditors to create accounting statements in the ordinary course of business. Because Claimants did not have a proprietary interest in the Performance Bonuses (as defined below) and NCM did not deceive the Claimants, the Court should deny the Claimants' claims for civil theft.**

**ANSWER:** Denied. NCM management was aware of how revenue under the contracts was to be applied and deliberately chose not to apply the agreed methodology and also to provide fraudulent statements to the Kinetoplay Claimants.

Further, NCM is judicially estopped from arguing that it had discretion to apply its so-called "standard accounting procedures" in calculating the bonus. *See Love v. Tyson Foods, Inc.,* 677 F.3d 258, 261 (5th Cir. 2012) (judicial estopped applies when "(1) the party against whom judicial estoppel is sought has asserted a legal position which is plainly inconsistent with a prior position; (2) a court accepted the prior position; and (3) the party did not act inadvertently.") NCM argued to the Colorado state court that the Employment Agreements and Consulting Agreement did *not* grant it such discretion. Based on this argument, the Colorado state court dismissed the Kinetoplay Claimants' claims for breach of good faith and fair dealing. NCM is attempting now to argue the opposite, *i.e.*, that it has the discretion to apply its own unilaterally determined "standard accounting procedures" rather than the allocation required under the contract. NCM is barred under the principles of judicial estoppel from taking this position, given its prior success in Colorado state court on this argument.

**6. NCM therefore seeks entry of an order disallowing the Claims in their entirety.**

**ANSWER:** To the extent an answer is required, the paragraph is denied.

<u>**JURISDICTION AND VENUE**</u>

**7. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This Objection is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). NCM confirms its consent, pursuant to Bankruptcy Rule 7008, to the entry of a final order.**

**ANSWER:** Admitted, but the Court should stay deciding the proofs of claim or the Objection until the entry of a final order in the California lawsuit. Under the principles of *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976), a Court will stay a federal proceeding when there is a parallel state proceeding based upon a review of six factors:

> (1) [A]ssumption by either court of jurisdiction over a res; (2) the relative inconvenience of the forums; (3) the avoidance of piecemeal litigation; (4) the order in which jurisdiction was obtained by the concurrent forums; (5) whether and to what extent federal law provides the rules of decision on the merits; and (6) the adequacy of the state proceedings in protecting the rights of the party invoking federal jurisdiction.

*Murphy v. Uncle Ben's, Inc.*, 168 F.3d 734, 738 (5th Cir. 1999) (citations omitted). The decision whether to stay "because of parallel state court litigation does not rest on a 'mechanical checklist' of these factors, but on a 'careful balancing' of them, 'as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction.'" *Id.* (citation omitted).

Here, on balance, it would be appropriate for the Court to stay this contested matter. Each Court has assumed jurisdiction over the matter (or is likely to). This forum is relatively inconvenient to all parties as none have ties to Texas, whereas most of the parties in the California litigation reside in California and NCM previously invoked LaVanchy and Tobin's California residence to obtain a dismissal of the Colorado Wage Act claims. Although jurisdiction may have first been invoked here, it has only been in the context of a proof of claim; no significant progress has been made in either forum. The merits of these claims and the claims in the California litigation will be based on state law, not federal law. Finally, California will adequately protect the rights of the Parties. Further, if the Kinetoplay Claimants are able to obtain a judgment and collect their damages from the defendants in the California litigation, the proofs of claim will be nullified. Overall, this balance augurs in favor of a stay pending the outcome of the California litigation.

**8. Venue is proper pursuant to 28 U.S.C. § 1408.**

**ANSWER:** Admitted, but the Court should stay its decision on the proofs of claim or the Objection until the entry of a final order in the California lawsuit.

9. **The bases for the relief requested in this objection are sections 105(a) and 502(a) and (b) of the Bankruptcy Code, Bankruptcy Rules 3001, 3007, and 9014, Bankruptcy Local Rule 3007-1, and the Complex Case Procedures. Pursuant to NCM's First Amended Chapter 11 Plan on April 26, 2023 [Docket No. 249] (the "Plan") and the Court's Order (I) Approving the Debtor's Disclosure Statement on a Final Basis and (II) Confirming the Modified First Amended Chapter 11 Plan of Reorganization of National CineMedia, LLC June 27, 2023 [Docket No. 457], this Court retained jurisdiction over claim objections.**

**ANSWER:** To extent that an answer is required, the Objection is denied.

## FACTUAL BACKGROUND

### The Agreements and the Performance Under the Agreements

10. **The Claimants formed Kinetoplay Inc. (the "Seller") in 2015 to create and manage online and mobile applications of cinema-related gaming. Complaint, ¶¶ 25–27.**

**ANSWER:** Admitted that the Kinetoplay Claimants formed Kinetoplay, Inc. ("Kinetoplay") in 2015, and the description is denied as inadequate and overly narrow. As stated in the Complaint, Kinetoplay, Inc. engaged in the business of creating and developing, commercializing and managing online and mobile applications of movie and cinema-related entertainment gaming and content business for consumer engagement and use, i.e., the Digital Gaming Products. Am. Compl. ¶ 25. The team that formed Kinetoplay also built, developed, commercialized and/or managed the gaming and content platforms for ESPN, FoxSports, Yahoo, the National Football League, and Endemol. Am. Compl. ¶ 26.

11. **Under the various agreements described below, in 2017, NCM bought Seller's digital gaming business and brought on LaVanchy and Tobin as employees and MB**

**Kinetoplay as a consultant to help manage and promote NCM's digital gaming pillar through various media outlets.**

ANSWER: Admitted that NCM acquired Kinetoplay pursuant to the terms of certain agreements, NCM executed employment agreements with LaVanchy and Tobin, and NCM executed a consulting agreement with Berry. Denied to the extent that the allegations misconstrue or mischaracterize those agreements, such as by too narrowly describing the assets acquired by NCM.

**12. On May 16, 2017, NCM entered into an Asset Purchase Agreement, by and among NCM, Seller, MB Kinetoplay, Sly Trunk LLC, and Monarch Jarvis LLC, for the purchase of substantially all of the assets of Seller (the "APA").**

ANSWER: Admitted.

**13. Seller, Sly Trunk, and Monarch Jarvis did not file a claim in this bankruptcy case or join the Claimants in their state court suit.**

ANSWER: Admitted.

**14. The APA defined "Business" as Kinetoplay Inc.'s "business of creating and developing, commercializing and managing online/mobile application of movie and cinemarelated entertainment gaming and content business for consumer engagement and use." APA, Recital A (emphasis added). With certain exceptions not in dispute here, the APA provided for NCM's purchase of assets involved in that Business.**

ANSWER: Denied. The APA states that Kinetoplay "is engaged in the business of creating and developing, commercializing and managing online/mobile application of movie and cinemarelated entertainment gaming and content business for consumer engagement and use." It defines "business," not as Kinetoplay's specific business assets, but *generally* as the "business of creating and developing, commercializing and managing online/mobile application of movie and

11

cinemarelated entertainment gaming and content business for consumer engagement and use,"
without regard to Kinetoplay specifically. Section 1.1 of the APA by contrast defines the specific
"purchased assets."

**15. A "Side Letter" was signed by NCM and Seller on May 16, 2017, regarding NCM's
funding of the post-acquisition Business to promote NCM's digital gaming pillar (the "Side
Letter"). The Side Letter provided that during the four-year period following the closing,
NCM would promote and fund the operation of the digital gaming pillar by contributing $30
million worth of media value, and $2.1 million in cash and qualified expenses to be used in
the digital gaming pillar's operating budget. These contributions by NCM were in addition
to the price paid to Seller and the yearly compensation and perks to the Claimants
(described below).**

**ANSWER:** Admitted that the Side Letter was executed, which speaks for itself. Denied to
the extent that the allegation mischaracterizes or misstates the Side letter, and in particular the
mischaracterization of the funding being used to "promote and fund the operation of the digital
gaming pillar." NCM agreed that it would fund the "Business" – including all of its intellectual
property, know-how, assets, first party data, and tech team – within its overall NCM umbrella of
products. The parties did not anticipate for example that NCM would set up or fund a "pillar" as a
stand-alone business. The Side Letter does not make reference to the phrase "pillar", and is contrary
to the plain language of the Side Letter (which explicitly refers to the Business being incorporated
into NCM's "umbrella of products").

**16. NCM spent and contributed more than the amounts set forth in the Side Letter.
As of March 2019, NCM had spent more than $2.3 million in cash and qualified expenses.
Kenwick Declaration, ¶ 4. By the end of 2019, NCM had contributed more than $30 million**

worth of media value. See Kenwick Declaration, ¶ 4. Because NCM had satisfied these obligations, NCM stopped tracking the amounts required under the Side Letter. Kenwick Declaration, ¶ 4.

**ANSWER:** The Kinetoplay Claimants lack knowledge or information sufficient to form a belief about the truth of this allegation, and for this reason deny it. However, it is notable that NCM would have been excused from making these contributions if the integration of Kinetoplay had been as unsuccessful as NCM has alleged.

17. On July 14, 2017, LaVanchy and Tobin entered into employment agreements with NCM (the "Employment Agreements"). See Employment Agreements. NCM and MB Kinetoplay entered into a consulting agreement on July 14, 2017, which contained similar relevant provisions as the Employment Agreements (the "Consulting Agreement," and together with the APA, Employment Agreements, Separation Agreements (as defined below), and Side Letter, the "Agreements"). See Consulting Agreement; compare Consulting Agreement § 4.3.1 with Employment Agreements, § 3(c).

**ANSWER:** Admitted.

18. Under the Employment Agreements, LaVanchy and Tobin were to earn a base salary of $87,500 for the first year of their employment with NCM, which amount increased through the fourth year of their employment to $160,000. Employment Agreements, § 3(a). This was in addition to the other usual employee benefits offered by NCM. Id., § 3(b).

**ANSWER:** Admitted that LaVanchy and Tobin entered employment agreements, denied to the extent that this mischaracterizes or misstates the Employment Agreements.

13

19. **LaVanchy and Tobin also had the chance to earn a "Business Performance Bonus" (the "Employee Performance Bonuses") in the event the digital gaming products achieved certain financial metrics:**

> In the event that the Business (as defined in the [APA]) achieves Five Million Dollars ($5,000,000) in revenue directly generated by the Business's digital gaming products in the Company's [NCM's] digital gaming pillar through advertising, sponsorship, tournaments, virtual goods and merchandise directly purchased from the Company's digital gaming pillar from the Company's website or revenue share generated through the purchase from an affiliate of the Company or partner site of the Company, and others as mutually agreed upon by the Company and the Employee (collectively "Digital Gaming Revenue") in the twelve (12) months prior to the third (3rd) anniversary of the date hereof (the "Third Year Revenue"), the Company shall pay [the Third Year Bonus.] In the event that the Business achieves Seven Million Five Hundred Thousand Dollars ($7,500,000) in Digital Gaming Revenue in the twelve (12) months prior to the fourth (4th) anniversary of the date hereof (the "Fourth Year Revenue"), the Company shall pay [the Fourth Year Bonus.]

**Employment Agreements, § 3(c) (emphasis added).**

> **ANSWER:** Admitted that LaVanchy and Tobin entered employment agreements, denied to the extent that this mischaracterizes or misstates the Employment Agreements. In particular, NCM is deliberately refusing to emphasize the manner in which the bulk of the revenue was generated during the period at issue, *i.e.*, through advertising and sponsoring.

20. **Under the Consulting Agreement, MB Kinetoplay was to earn $60,000 for the first year of the Consulting Agreement, which amount increased through the fourth year of the Consulting Agreement to $120,000. Consulting Agreement, § 4 and Exhibit A. This was in addition to other benefits and perks offered by NCM. Id. Similarly to the Employment Agreements, the Consulting Agreement provided for a "Business Performance Bonus" (the "Consultant Performance Bonus," and along with the Employee Performance Bonuses, the "Performance Bonuses") in the event the digital gaming products generated certain revenue**

14

amounts. Id. § 4.3. The Consulting Agreement contained language similar to the

Employment Agreements, although the potential bonus amount was larger than that

possible under the Employment Agreements:

> In the event that the Business (as defined in the [APA]) achieves at least Five Million Dollars ($5,000,000) in revenue directly generated by the Business's digital gaming products in the Company's [NCM's] digital gaming pillar through advertising, sponsorship, tournaments, virtual goods and merchandise directly purchased from the Company's digital gaming pillar from the Company's website or revenue share generated through the purchase from an affiliate of the Company or partner site of the Company, and others as mutually agreed upon by the Company and the Consultant (collectively "Digital Gaming Revenue") in the twelve (12) months prior to the third (3rd) anniversary of the date hereof (the "Third Year Revenue"), the Company shall pay [the Third Year Bonus.] In the event that the Business achieves at least Seven Million Five Hundred Thousand Dollars ($7,500,000) in Digital Gaming Revenue in the twelve (12) months prior to the fourth (4th) anniversary of the date hereof (the "Fourth Year Revenue"), the Company shall pay [the Fourth Year Bonus.] Consulting Agreement, § 4.3.1 (emphasis added).

ANSWER: Admitted that Berry executed the Consulting Agreement, and denied to the extent that

this mischaracterizes or misstates the Consulting Agreement. In particular, NCM is deliberately

refusing to emphasize the manner in which the bulk of the revenue was generated during the period

at issue, *i.e.*, through advertising and sponsoring.

21. The relevant time periods for the Employee Performance Bonuses were July 14,

2019 through November 28, 2020 (the "Employee Third Year Bonus Period"), and

November 29, 2020 through November 28, 2021 (the "Employee Fourth Year Bonus

Period," and together with the Employee Third Year Bonus Period, the "Employee Bonus

Periods"). See Kenwick Declaration, ¶ 7. The relevant time periods for the Consultant

Performance Bonus were July 14, 2019 through July 13, 2020 (the "Consultant Third Year

Bonus Period"), and July 14, 2020 through July 13, 2021 (the "Consultant Fourth Year Bonus

Period," and together with the Consultant Third Year Bonus Period, the "Consultant Bonus Periods").

**ANSWER:** Admitted that the Kinetoplay Claimants executed their respective Employment Agreements and Consulting Agreement, and denied to the extent that this misstates or mischaracterizes those agreements. Further, the allegations in footnotes 6 and 7 are denied.

22. The Claims depend on NCM's digital gaming pillar hitting the identified revenue thresholds. The digital gaming pillar's products are mostly consumer-facing, whereas NCM's core business is at the enterprise, or business-to-business, level. Canning Declaration, ¶ 7. NCM's digital gaming pillar provides digital gaming products for consumers to play on stand-alone websites or phone apps outside the theater or while waiting for the trailers to start as prompted by on-screen advertisements. Canning Declaration, ¶ 7. The digital gaming products are ad-supported with the sales of sponsorship of a game, advertising opportunities within a game, and potentially, virtual goods and merchandise directly related to the digital games. Canning Declaration, ¶ 7. During the Bonus Periods, NCM's overall sales strategy included offering advertisers in-theater advertising products (which includes on-screen and lobby advertising), digital advertising products, and gaming advertising products. Canning Declaration, ¶ 7. Advertisers would select which advertising products to include in a campaign, with the on-screen advertising being the core of NCM's business. Canning Declaration, ¶ 7. By way of example, in 2019, NCM ran a campaign with BallPark Franks, in which an advertisement for BallPark Franks was shown on the pre-show big screen. Canning Declaration, ¶ 7. After the advertisement was displayed, attendees in the theater were given an opportunity to participate in an augmented reality experience, in which they used their phones to interact

16

**with the big screen and trigger a race in which they controlled hot dogs racing around a**

**virtual track. Canning Declaration, ¶ 7. The augmented reality experience, the hot dog race,**

**was an example of how NCM used the big screen to integrate technology developed by**

**NCM in its digital gaming pillar. Canning Declaration, ¶ 7. This was one of the limited**

**examples in which NCM was able to generate revenue via the digital gaming pillar.**

**Canning Declaration, ¶ 7.**

ANSWER: Denied. As said, the digital gaming pillar as that phrase is used in the

Employment and Consulting Agreement does not reference a stand-alone division or business; it

refers to the only segment of NCM's new 2017 digital strategy that NCM ever carried out, and

which included nearly every digital offering of NCM.

For example, on February 25, 2019, Cliff Marks, then CEO of NCM, touted the success of

the "advergaming" strategy in creating first party data. *See* Ex. 2. He explained:

> "Our advertisers are demanding to know more about our audience," NCM CEO
> Cliff Marks told Cheddar Monday. "Our advertisers want us to have first-party data,"
> explained Marks. "With the advent of Noovie Arcade and gaming like that, it allows
> you to have a good time while you're in the theater, because it's going to be a lot of
> fun, and it allows us to secure some data that we, of course, use within all of the
> privacy rights."

> "Our vision is that we'll create 'adver-gaming,' where brands can actually create these
> really fun games that are engaging, and consumers love, but their brand is the hero of
> the games," Marks said.

The Kinetoplay Claimants are aware of NCM generating millions of dollars in revenue from

these advertising strategies, through sponsorship, advertising, and generating first party data across

numerous initiatives.

The Digital Gaming Products, as defined in the various Agreements, were thus integrated

into numerous sponsorship and advertising initiatives at NCM, yet the revenue from those initiatives

were not credited to the Kinetoplay Claimants. Had NCM provided truthful accounting, the revenue would have exceeded the maximum for the bonuses.

**23. Prior to the acquisition of the Business, NCM had other digital products that were separate and apart from the digital gaming pillar. See Canning Declaration, ¶ 4. These digital products remained separate and apart from the digital gaming pillar throughout the Bonus Periods. See Canning Declaration, ¶ 4.**

**ANSWER:** Denied. All of NCM's digital products (in particular Noovie) integrated the data, know-how and IP from Kinetoplay following the acquisition. In announcing the acquisition in May 2017, Marks, then President of NCM, proclaimed that Fantasy Movie League was to be an "exciting part of the ***new*** Noovie digital strategy." Ex. 3 (emphasis added). When the acquisition closed in July 2017, NCM's (then) Chief Digital Officer and Senior Vice President of Corporate Development confirmed with investors and with the public that the acquisition of Fantasy Movie League was the "first step in NCM's ***new*** digital strategy," referring to Noovie. Ex. 4 (emphasis added).

As said, the "digital gaming pillar" was never a "separate" business; it <u>was</u> the digital business from 2017 forward since NCM largely abandoned the other two digital "pillars" (ticketing and content). Further, the Digital Gaming Products (i.e., the business of Fantasy Movie League) was integrated into NCM's overall digital business, and revenue from those integrations were supposed to be included on the earn out bonuses, but were not.

**24. One of those digital products is NCM's Cinema Accelerator (now referred to as Noovie Audience Accelerator), which was launched in 2015 and through which NCM sells digital (online and mobile) advertising to clients (the "Accelerator Digital Product"). Through the Accelerator Digital Product, NCM provides contractual guarantees to deliver a specified number of advertising impressions of the advertiser's content. The digital**

**inventory on which these advertising impressions are displayed is purchased by NCM through advertising exchanges to meet the advertiser's target audience and scale. NCM purchases this third-party digital inventory because NCM does not generate a material, scaled volume of inventory on its owned and operated products. Canning Declaration, ¶ 5. The Claimants were never a part of the team responsible for the Accelerator Digital Product. Canning Declaration, ¶ 5.**

ANSWER: Denied. In 2017, NCM did a "re-launch" of this product and represented to the Kinetoplay Claimants, to investors, to clients, and to the public at large that the Kinetoplay/Fantasy Movie League acquisition would be a critical part of the product. Exhibit 5 is the press release announcing the launch of Noovie, prominently featuring Fantasy Movie League and its digital gaming products as one of cornerstones of that launch. During that upfront event, Cliff Marks (then CEO of NCM) further stated in prepared remarks: "And for NCM, Fantasy Movie League will be an important source of first-party data on these highly engaged movie fans, and will give us the ideal digital ad inventory to target them beyond the big screen." The revenue from the Accelerator Digital Product should have been credited to the Kinetoplay Claimants on the bonus calculation.

**25. The Accelerator Digital Product generated revenue of $8,127,960 in 2016, the year before the Agreements, and revenues of $10,762,677 in 2017, $11,492,585 in 2018, $12,638,671 in 2019, $13,358,195 in 2020, and $11,585,032 in 2021. See Kenwick Declaration, ¶ 13.**

ANSWER: The Kinetoplay Claimants lack knowledge or information sufficient to form a belief about the truth of the allegation and for that reason deny it. It is telling however that NCM is reporting significant revenue from 2017 when it first ingested the first party data from Fantasy Movie League, and then the reported revenue grew nearly 50% over the next three years as NCM continued to integrate the assets, know how, IP and tech team it acquired from the Kinetoplay

Claimants. By NCM's admission, it got exactly what it was promised from the Kinetoplay Claimants, and yet still has not paid for it.

**26. Another separate digital product is NCM's Digital Out-of-Home ("DOOH"), for which the sales group began selling DOOH media inventory in October of 2020 (the "DOOH Product"). Through the DOOH Product, NCM sells advertisements that are placed on devices or screens in restaurants, on ATMs, and on college campuses. Canning Declaration, ¶ 6. The Claimants were never a part of the team responsible for the DOOH Product. Canning Declaration, ¶ 6.**

**ANSWER:** Denied. DOOH is simply a platform by which users can interact with games. As such, it is also a Digital Gaming Product, not a "separate digital product," that should have been credited as part of the bonus calculation.

**27. The DOOH Product generated revenues of $0 in 2020 and $2,239,157 in 2021. See Kenwick Declaration, ¶ 13.**

**ANSWER:** The Kinetoplay Claimants lack knowledge or information sufficient to form a belief about the truth of the allegation and for that reason deny it.

**28. Revenue related to either the Accelerator Digital Product or the DOOH Product is not digital gaming pillar revenue and therefore was not included in the calculations of the Performance Bonuses. Kenwick Declaration, ¶ 13.**

**ANSWER:** Denied.

**29. The digital gaming pillar did not perform as NCM and the Claimants had hoped. Kenwick Declaration, ¶ 12. Digital gaming revenues were approximately $2,657 in 2017, the first year following the Agreements. Kenwick Declaration, ¶ 12. Digital gaming revenues increased to $286,557 in 2018 and $523,718 in 2019. Kenwick Declaration, ¶ 12. Unfortunately,**

the COVID19 pandemic decimated the film and theater industries. Kenwick Declaration, ¶ 12. While the digital gaming revenues were $644,466 for the Consultant Third Year Bonus Period and $644,953 for the Employee Third Year Bonus Period, revenues steeply declined in the last year of the Performance Bonuses, and digital gaming revenues were $2,562.63 for the Consultant Fourth Year Bonus Period and $5,116.61 for the Employee Fourth Year Bonus Period. Kenwick Declaration, ¶ 12. This fall in digital gaming revenues coincided with industry-wide headwinds, with NCM's total revenue declining significantly over the same period. Kenwick Declaration, ¶ 12.

ANSWER: Denied. NCM is deliberately refusing to include within its calculations numerous revenue streams that should have been allocated for bonus purposes, including the advertising and sponsorships that featured digital gaming products, and the Accelerator and DOOH products. NCM is aware that these streams should have been included in the calculations, yet provided fraudulent statements to the Kinetoplay Claimants.

### The State Court Suit

30. The Claimants filed their Amended Complaint (the "Complaint") on June 10, 2022. The Claimants sued NCM under four theories: (1) Breach of Contract; (2) Breach of Duty of Good Faith; (3) Civil Theft; (4) Violation of Colorado Wage Claim Act. Only LaVanchy and Tobin asserted the CWCA Claims.

ANSWER: Admitted.

31. NCM filed the Defendant's Motion to Dismiss (the "MTD") the state court claims on July 25, 2022, under the Colorado procedural rule for failure to state a claim. See Colorado Rule of Civil Procedure 12(b)(5).

ANSWER: Admitted that the Motion was filed, and otherwise denied.

21

**32. On March 24, 2023, the state court entered an Order on Defendant's Motion to Dismiss (the "MTD Order"), granting the MTD in part and dismissing the cause of action for breach of duty of good faith and the CWCA Claims. The MTD Order is attached hereto as Exhibit C.**

**ANSWER:** The MTD Order speaks for itself and the allegation is denied to the extent that it misstates or mischaracterizes the MTD Order. In particular, the Court determined that the Colorado Wage Act did not apply to LaVanchy and Tobin because they are not Colorado residents; LaVanchy and Tobin have thus filed suit under the applicable California law in California courts against non-debtors.

**33. The MTD Order was the last substantive entry on the state court docket before NCM filed for bankruptcy protection.**

**ANSWER:** Admitted.

**The Chapter 11 Case**

**34. On April 11, 2023 (the "Petition Date"), NCM filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.**

**ANSWER:** Admitted.

**35. The Claimants filed their proofs of claim on May 30, 2023. Each Claimant asserts general unsecured claims for breach of contract and civil theft, but MB Kinetoplay's alleged damages are almost five times the amounts claimed by Tobin and LaVanchy: $15,108,000 for MB Kinetoplay vs. LaVanchy's and Tobin's $3,133,075 claims.**

**ANSWER:** The proofs of claim speak for themselves, and the allegation is denied to the extent that it misstates or mischaracterizes the proofs of claim. In particular, the theft claim also includes treble damages and attorney fees, and thus the amounts of each claim are actually more

than triple the amount stated in the allegation. Further, the Kinetoplay Claimants reserve the right to amend their claims to include (among others) California wage act claims.

**36. The Court confirmed NCM's First Amended Chapter 11 Plan on June 27, 2023 [Docket No. 457]. The Plan went effective on August 7, 2023.**

**ANSWER:** The Confirmation and the Plan speak for themselves, and this allegation is denied to the extent that it misstates or mischaracterizes those documents.

**37. NCM is operating its business and managing its property as a reorganized debtor.**

**ANSWER:** The Kinetoplay Claimants lack knowledge or information sufficient to form a belief about the truth of the allegation and for that reason deny it.

<u>**OBJECTION**</u>

**38. NCM seeks entry of an order disallowing the Claims in their entirety because the claims are unenforceable under any agreement or applicable law. Within this Objection, NCM addresses the Claimants' remaining allegations from the State Court Suit and asserts that such allegations fail as a matter of law and fact. See 11 U.S.C. § 502(b)(1) ("such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law").**

**ANSWER:** The fact of an Objection is admitted, and its merits are denied.

**39. Section 502 of the Bankruptcy Code deems the allowance of a claim or interest, proof of which is filed under section 501 of the Bankruptcy Code "unless a party in interest . . . objects." 11 U.S.C. § 502.**

**ANSWER:** Section 502 of the Bankruptcy Code speaks for itself and the allegation is denied to the extent that it misstates or mischaracterizes Section 502.

40. A proof of claim loses the presumption of prima facie validity under Bankruptcy Rule 3001(f) if an objecting party refutes at least one of the allegations that are essential to the claim's legal sufficiency. *See In re Fidelity Holding Co., Ltd.*, 837 F.2d 696, 698 (5th Cir. 1988) ("If, however, evidence rebutting the claim is brought forth, then the claimant must produce additional evidence to prove the validity of the claim by a preponderance of the evidence.") (citation and internal quotation omitted); *see also In re Jack Kline Co., Inc.*, 440 B.R. 712, 742 (Bankr. S.D. Tex. 2010) ("A proof of claim is prima facie evidence of the pre-petition debt owed, and the burden is on the party challenging the allowance of the proof of claim to overcome the presumption."). Once such an allegation is refuted, the burden reverts to the claimant to prove the validity of its claim by a preponderance of the evidence. *Fidelity Holding*, 837 F.2d at 698. Thus, even with the burden-shifting framework, "the ultimate burden of proof always lies with the claimant." *In re Armstrong*, 347 B.R. 581, 583 (Bankr. N.D. Tex. 2006) (citing *Raleigh v. Ill. Dep't of Rev.*, 530 U.S. 15 (2000)).

**ANSWER:** The case law on the burden for a proof of claim speaks for itself and the allegation is denied to extent that it misstates or mischaracterizes that law.

### The Agreements Provided for Performance Bonuses Based Only on Revenue Directly Generated by Digital Gaming Products

41. NCM objects to the Claims and seeks entry of an order disallowing them in their entirety because the Performance Bonuses were not earned.

**ANSWER:** Denied.

42. The Claimants, referencing their Complaint in the State Court Suit, argue that the digital gaming pillar reached the revenue necessary to trigger the Performance Bonuses and that NCM undercounted the relevant revenues. The Claimants' repeated references to

"digital products" overstate the revenues earned by the digital gaming pillar to try to capture the unearned Performance Bonuses. *See, e.g.*, Complaint, ¶¶ 10, 53, 55–59. Applying the correct term from the Agreements—"digital gaming products"—the revenues fall short. *See* Employment Agreements, § 3(c) (emphasis added); Consulting Agreement, § 4.3.1 (emphasis added). The Claimants fail to acknowledge that NCM has unrelated digital products, including the Accelerator Digital Product and the DOOH Product, that generate revenue separate and apart from the digital gaming pillar, and that these revenues do not count towards the Performance Bonuses. *See* Canning Declaration, ¶¶ 4, 8; Kenwick Declaration, ¶ 13. Similarly, NCM's core on-screen product is not a part of the digital gaming pillar, and the on-screen product generates revenue separate from the digital gaming pillar. *See* Canning Declaration, ¶¶ 4, 8; Kenwick Declaration, ¶ 14. Thus, the revenue from the on-screen product does not count toward the Performance Bonuses, either.

**ANSWER:** Denied. NCM integrated the Digital Gaming Products into numerous facets of its business, specifically including the "Accelerator Digital Product" and the "DOOH Product," among others. The Parties further intended that revenue "directly generated" from advertising and sponsorship that integrated Digital Gaming Products, among others, be credited for purposes of the bonus allocation. Indeed, the anticipated integration of the Digital Gaming Products across NCM's business was the very purpose of the acquisition, and the value that Kinetoplay provided. The Parties intended that the Kinetoplay Claimants receive credit for that benefit. Neither Canning nor Kenwick have any personal knowledge about what the parties intended in this respect as neither worked at NCM when the acquisition was completed and did not participate in the negotiations.

43. Because the Performance Bonuses were not earned, the Claimants cannot establish breach of the Agreements or civil theft. The claims are duplicative in that both are based on the same alleged withholding of the Performance Bonuses.

**ANSWER:** Denied.

44. As noted in the Employment Agreements and Consulting Agreement, the relevant revenue was that revenue "*directly generated by the Business's digital gaming products* in the Company's [NCM's] digital gaming pillar through advertising, sponsorship, tournaments, virtual goods and merchandise *directly purchased* from the Company's digital gaming pillar from the Company's website or revenue share generated through the purchase from an affiliate of the Company or partner site of the Company, and others as mutually agreed upon by the Company [and the Employee or Consultant] …." Employment Agreements, § 3(c) (emphasis added); Consulting Agreement, § 4.3.1 (emphasis added).

**ANSWER:** Admit that this is a quote of a portion of the Employment Agreements and Consulting Agreement, but this allegation deliberately misstates and de-emphasizes key portions of the agreement. First, the term "Business" is broadly defined in the referenced Asset Purchase Agreement. Second, the term "directly purchased" only refers to "merchandise" and not to "advertising, sponsorship, tournaments [or] virtual goods". These latter items cannot be "purchased;" they are custom tailored to each individual client. As NCM well knows, the Parties intended that revenue generated by advertising, sponsorship, tournaments and virtual goods that integrated the Digital Gaming Products was supposed to be credited for bonus purposes – and NCM deliberately left those off of the calculation despite being worth tens of millions of dollars.

45. Despite the limiting language of "directly generated," "digital gaming products," and "digital gaming pillar," the Claimants attempt to argue that they were responsible for

some massive portion of NCM's total revenue during the Bonus Periods, a portion large enough to ensure the Claimants can claim the Performance Bonuses. *See* Complaint, ¶¶ 9–12, 59–60.

**ANSWER:** The Complaint states what it states and the allegation is denied to the extent that it mischaracterizes the Complaint. As stated above, NCM is deliberately misreading and de-emphasizing the breadth of the bonus provisions, which require that integrated products be credited for purposes of the bonus calculation.

46. In reality, NCM's total revenue was normal in the years following the Agreements, with the exception of 2020 and 2021, which were disrupted by the COVID-19 pandemic. *See* Kenwick Declaration, ¶ 6. NCM's total revenue in the year preceding the Agreements, 2016, was $447.6 million. For the years encompassed at least partially by the Agreements, NCM posted total revenues of $426.1 million for 2017, $441.4 million for 2018, $444.8 million for 2019, $90.4 million for 2020, and $114.6 million for 2021. *See* Kenwick Declaration, ¶ 11. If the Claimants were responsible for the large amounts they suggest, NCM should have seen some large increase in total revenue after the parties entered into the Agreements. Instead, NCM's total revenue was greatest in 2016—the year before the APA was signed.

**ANSWER:** Denied. This argument mischaracterizes the claims of the Kinetoplay Claimants. As NCM reported to the shareholders of its parent company, NCM's integration of the Kinetoplay digital assets, know-how and data likely allowed NCM to be far more successful than it otherwise would have been. The revenue generated from this integration was supposed to be credited for purposes of the bonus, yet NCM deliberately left it out of the bonus calculation in fraudulent accounting statements.

47. The Claimants fail to include in their Claims any calculation of revenue directly generated by the digital gaming pillar. Instead, Claimants conveniently omit "gaming" from the restrictive language in the Employment Agreements and Consulting Agreement, and cite to NCM statements relating to "digital products" and "digital components," many of which pertain to periods before the Bonus Periods, to then argue that "digital gaming products" were responsible for some large portion of NCM's total revenue. *See, e.g.*, Complaint, ¶ 10 (referencing NCM's 2018 annual report, which noted that an increased percentage of advertising purchases had a "digital component" and that "digital products," including some digital gaming products, helped drive NCM's core on-screen advertising business).

**ANSWER:** Denied. As stated above, it is NCM who is conveniently omitting that it had no significant digital presence prior to the acquisition of Fantasy Movie League, that the term "digital gaming pillar" was in fact intended by the Parties to reference a broad new digital initiative beginning in the fall of 2017 (including Noovie), that the assets NCM acquired were critical to the success of that initiative, and that the parties intended that the Kinetoplay Claimants be compensated accordingly. And it is NCM who is conveniently ignoring the key terms of the bonus provision that was to credit revenue generated from advertising and sponsorship, among other things.

48. Digital gaming revenues were approximately $2,657 in 2017, and increased to $286,557 in 2018 and $523,718 in 2019. *See* Kenwick Declaration, ¶ 12. Unfortunately, the COVID-19 pandemic decimated the film and theater industries. *See* Kenwick Declaration, ¶ 12. While the digital gaming revenues were $644,466 for the Consultant Third Year Bonus Period and $644,953 for the Employee Third Year Bonus Period, revenues steeply declined

in the last year of the Performance Bonuses, and digital gaming revenues were $2,562.63 for the Consultant Fourth Year Bonus Period and $5,116.61 for the Employee Fourth Year Bonus Period. *See* Kenwick Declaration, ¶ 12. This fall in digital gaming revenues coincided with industry-wide headwinds, with NCM's total revenue declining significantly over the same period. *See* Kenwick Declaration, ¶ 12.

**ANSWER:** Denied. Although the COVID-19 pandemic affected the film and theater industries, NCM is deliberately understating the revenue that should have been allocated for bonus purposes by leaving out advertising and sponsorship revenue, among others.

49. Further, NCM's other digital products are not included in the digital gaming pillar. One such product is NCM's Accelerator Digital Product, which generated revenues of $8,127,960 in 2016, the year before the Agreements, and revenues of $10,762,677 in 2017, $11,492,585 in 2018, $12,638,671 in 2019, $13,358,195 in 2020, and $11,585,032 in 2021. *See* Kenwick Declaration, ¶ 13. The DOOH Product, another digital product separate from the digital gaming pillar, generated revenues of $0 in 2020 and $2,239,157 in 2021. *See* Kenwick Declaration, ¶ 13.

**ANSWER:** Denied. As said, over the course of the Employment Agreement and the Consulting Agreement, nearly all digital products were digital gaming products derived from the "digital gaming pillar," given the failure of the other pillars. This specifically includes the "Accelerator Digital Product" and the "DOOH Product," and each of their revenues should have been included in the bonus allocation.

50. NCM did not sell any merchandise, virtual goods, or data sets relating to digital gaming products over the course of the Bonus Periods. Kenwick Declaration, ¶ 18.

**ANSWER:** Denied. NCM is deliberately not referencing advertising, sponsorship, or tournament revenue, which is specifically included in the bonus calculation.

**51. NCM properly prepared accounting statements (the "Accounting Statements") and provided these to the Claimants. Kenwick Declaration, ¶ 17. NCM created the Accounting Statements in the ordinary course of business by using NCM's standard accounting procedures, explained below, and the information underlying the Accounting Statements was subject to NCM's accounting audit. *See* Kenwick Declaration, ¶ 17. In accordance with those procedures, NCM properly attributed revenue, if any, to any digital gaming products included in contracts with NCM customers. Kenwick Declaration, ¶ 17.**

**ANSWER:** Denied. From prior to the acquisition and continuing forward, NCM was aware that the bonus calculations needed to follow the letter of the contracts and that NCM could not replace that calculation methodology with its so-called "standard accounting procedures." Indeed, as the Colorado court ruled (on NCM's motion), NCM had *no* discretion to employ any methodology other than that specifically set forth in the Employment Agreements and the Consulting Agreement. NCM violated the Employment Agreements and the Consulting Agreement by deliberately excluding revenue that it knew should have been allocated. The so-called "standard accounting procedures" are little more than Hollywood accounting designed to defraud the Kinetoplay Claimants.

**52. NCM uses a standard accounting process to attribute revenue across the various products that may be included in a single contract. Kenwick Declaration, ¶ 15. To account for the added value, and in accordance with Accounting Standards Codification 606 – Revenue from Contracts with Customers ("ASC 606"), NCM allocates revenue to each underlying performance obligation within a contract that has standalone value. Kenwick**

**Declaration, ¶ 15. As part of this process, NCM has an annual key control under the Sarbanes-Oxley Act whereby it prepares a memo outlining all products that were included in contracts as added value and assigns a fair value to those products based upon the methods outlined within ASC 606 (i.e., either standalone selling value, competitor pricing, or cost-plus margin). Kenwick Declaration, ¶ 15. In the instance of digital gaming products, NCM utilized the standalone selling value, as there were no direct competitive pricing available or any incremental costs incurred to allow for the cost-plus margin method to be utilized. Kenwick Declaration, ¶ 15. NCM utilized the limited standalone sales of sponsorships in order to develop the fair value utilized to allocate revenue to digital gaming products when included in an opportunity at $0. As a key Sarbanes-Oxley control, this memo and process are reviewed by NCM's external auditor, Deloitte & Touche LLP, and internal auditor, and as pertains to the digital gaming pillar, each auditor deemed the memo and process to be operating effectively. Kenwick Declaration, ¶ 15. Additionally, the underlying digital gaming pillar revenue was subject to NCM's external auditor's testing, and no issues were identified. Kenwick Declaration, ¶ 15. NCM follows ASC 606 for all of its revenue attributions, not just those for the digital gaming pillar. Kenwick Declaration, ¶ 16.**

ANSWER: Denied. NCM cannot hide behind so-called "standard accounting procedures" to deviate from the letter of the contract. There is no canon of contract construction that allows NCM to deviate from the intentions of the parties in determining how to allocate bonuses. NCM is also skirting the basic issue: whether it decided to include a particular revenue stream when calculating the earn-out bonuses. Calculating the bonus was not a valuation exercise under ASC 606, and NCM did not delegate its responsibilities in this regard to an auditor. The auditor may verify the value of the revenue stream, but the initial decision on whether to value that revenue stream *at all*

rests with NCM. NCM, not the auditor, determines whether (for example) to include in the bonus calculation revenue that it received from advertising or sponsorship that integrated a Digital Gaming Product. NCM apparently chose not to include such revenue, in direct contravention of the agreement, and in an attempt to keep Kinetoplay Claimants from receiving any material benefit from the Fantasy Movie League acquisition.

**53. Due to the digital gaming pillar's poor performance and the impact of COVID-19 on the theater business, NCM parted ways with LaVanchy and Tobin in October 2020, but permitted them to remain eligible for Performance Bonuses for the Employee Fourth Year Bonus Period, which began after their departure. Despite the lack of revenue being generated from the digital gaming pillar, NCM completed the terms of the Consulting Agreement, which expired according to its terms. Kenwick Declaration, ¶ 8.**

**ANSWER:** Denied. The reasons for the separation of LaVanchy and Tobin had nothing to do with performance. LaVanchy and Tobin received several outstanding performance reviews. This is the first time, years after the fact, that NCM has suggested it terminated LaVanchy or Tobin due to alleged "poor performance," which is yet more evidence of NCM's willful misconduct in failing to pay the earned bonuses. And NCM never completed the terms of the Consulting Agreement.

**54. The Claims should be denied because the revenue directly generated by NCM's digital gaming pillar fell well short of the $5 million and $7.5 million thresholds required for the Performance Bonuses over the respective Bonus Periods. The Claimants, realizing that the thresholds have not been met, have resorted to desperate tactics to increase the scope of revenue potentially attributable to the digital gaming pillar in an effort to meet these thresholds. This Court should limit the scope of applicable revenue to the contractually agreed digital gaming pillar.**

**ANSWER:** Denied. NCM has been deliberately miscounting the revenue that was supposed to be allocated to the Kinetoplay Claimants for bonus purposes, in an effort to pay effectively nothing for an acquisition that has facilitated tens of millions of dollars of revenue for the company. **The Claims for Civil Theft Must Fail for the Additional Reason that Claimants Cannot Prove Anything More Than a Creditor–Debtor Relationship**

55. **"To recover under the statute, the owner must prove that the taker committed acts constituting at least one of the statutory crimes of theft, robbery, or burglary."** *Bermel v. BlueRadios, Inc.*, **440 P.3d 1150, 1156–57 (Colo. 2019). To show that the taker committed the crime of theft, "all of its statutory elements must be proved, including the two culpable mental states: (1) that the defendant knowingly obtained control over the owner's property without authorization and (2) that he or she did so with the specific intent to permanently deprive the owner of the benefit of property."** *Itin v. Ungar*, **17 P.3d 129, 134 (Colo. 2000) (citing C.R.S. § 18–4–401(1)).**

**ANSWER:** The Colorado civil theft statute, C.R.S. § 18-4-401 *et seq.*, speaks for itself and the allegation is denied to the extent that it mischaracterizes or misstates the statute. In particular, the civil theft statute at the time was as follows:

(1) A person commits theft when he or she knowingly obtains, retains, or exercises control over anything of value of another without authorization or by threat or deception; or receives, loans money by pawn or pledge on, or disposes of anything of value or belonging to another that he or she knows or believes to have been stolen, and:

(a) Intends to deprive the other person permanently of the use or benefit of the thing of value;

(b) Knowingly uses, conceals, or abandons the thing of value in such manner as to deprive the other person permanently of its use or benefit;

(c) Uses, conceals, or abandons the thing of value intending that such use, concealment, or abandonment will deprive the other person permanently of its use or benefit;

(d) Demands any consideration to which he or she is not legally entitled as a condition of restoring the thing of value to the other person;  or

(e) Knowingly retains the thing of value more than seventy-two hours after the agreed-upon time of return in any lease or hire agreement.

**56. The Colorado Supreme Court has repeatedly held that the statutory definition of theft is not met where there is only a dispute between a debtor and a creditor over money owed.** *See People v. Treat,* **568 P.2d 473, 477 (Colo. 1977);** *People v. Rotello,* **754 P.2d 765, 767 (Colo. 1988).** *Ortiz v. Cervantes,* **No. 19-CV-30517, 2020 Colo. Dist. LEXIS 2567, at \*8–9 (Colo. Dist. Ct. Aug. 4, 2020), applied these decisions to grant summary judgment on a civil theft claim for unpaid services, pointing out the distinction "between owing money to someone and taking money from someone." Only the latter is actionable as theft.** *Id.*

**ANSWER**: The case law on civil theft speaks for itself and this allegation is denied to the extent that it mischaracterizes or misstates the law. Notably, NCM raised this argument with the Colorado state court on the Motion to Dismiss, and was denied. As the Kinetoplay Claimants successfully argued in response to the Motion to Dismiss, NCM's position contradicts the ordinary meaning of the words in the theft statute, which defines theft as when a person knowingly "***obtains, retains, or exercises control over*** anything of value of another without authorization or by . . . deception . . . and [i]ntends to deprive the other person permanently of the use or benefit of the

thing of value" C.R.S. § 18-4-401(1)(a) (emphasis added). NCM's interpretation would render superfluous the terms "retains" and "exercises control over." *See People v. Null*, 233 P.3d 670, 679 (Colo. 2010) (courts read statutes so that words and phrases are not rendered superfluous). Indeed, the primary case relied on by NCM, *People v. Treat*, 568 P.2d 473, 477 (Colo. 1977), holds that "even though initial control of the property has been authorized; the intent to deprive, or knowing use inconsistent with the owner's benefit, may arise at a later time when control is no longer authorized. At that time, the requisite elements of theft exist." NCM committed theft by knowingly retaining something of value it owed the Kinetoplay Claimants (*i.e.*, their earn-out bonuses) and using deception to retain them through false accounting statements.

The other cases cited by NCM are inapposite, and if anything, support the Kinetoplay Claimants. Unlike the theft claims here, the theft claims in the cases cited by NCM did not involve allegations of deception, and thus were just debtor-creditor relationships. *See Carlson*, 72 P.3d at 418 (distinguishing the case from *Rotello*, 754 P.2d 765 and affirming theft conviction when defendant actively deceived the victim). In *Treat*, the Colorado Supreme Court largely *allowed* the State to proceed with theft charges because the defendant was alleged to have done many of the same things as NCM here, *i.e.*, retaining proceeds beyond what was initially authorized by contract, and then engaging in deception to attempt to allay his victim. 568 P.2d at 475-78. The *only* charge that was properly dismissed involved one instance in which the defendant failed to pay rental allocations, but there was no evidence with respect to that charge of a possessory right to the proceeds or to deception by the defendant. *Id.* at 477. That portion of *Treat* is not relevant here.

**57. As stated, NCM created the Accounting Statements in the ordinary course of business by using NCM's standard accounting procedures, and the information underlying the Accounting Statements was subject to NCM's accounting audit.** *See* **Kenwick**

**Declaration, ¶ 17. The Claimants have not shown otherwise; rather, they suggest that NCM "twisted its accounting" by failing to allocate revenue to the digital gaming pillar for bonus purposes.** *See* **Complaint, ¶¶ 81, 82, 99. And so any disagreement about NCM's accounting methods is a bona fide dispute between NCM and the Claimants on how to account for the standalone selling value of digital gaming products. The Claimants still not have shown that any Performance Bonus purportedly owed was their property.** *See Kelley v. People,* **402 P.2d 934 (Colo. 1965).**

ANSWER: Denied. This is not a "bona fide" dispute. It is a fraud by NCM. NCM is aware of how it is required to allocate revenue for purposes of the bonus and deliberately chose to misstate the revenue allocated for bonus purposes. The decisions on how to calculate the bonus rested with NCM's senior management, not with accounting staff. NCM's conscious decision to only include declarations from accounting staff – not senior management – is yet more evidence that NCM is trying to hide its misconduct.

Further, the Kinetoplay Claimants had a "proprietary interest" in their bonuses, and thus have standing to assert theft claims. C.R.S. § 18-4-401(1.5). In *People ex rel. VanMeveren v. Dist. Court In & For Larimer Cnty.*, 619 P.2d 494, 497–98 (Colo. 1980), the Colorado Supreme Court interpreted the term "proprietary interest" in connection with a similarly worded arson statute, where the defendant was convicted of burning a property that he owned outright, but which was subject to a secured lien. The Colorado Supreme Court explained that the lien was a "proprietary interest" by a secured creditor for the purposes of the statute, even though the arsonist had a superior possessory right to the creditor:

> "Proprietary interest" is a protean concept the meaning of which emerges from contextual use and application. It has been used to characterize a multiplicity of interests, such as control and dominion, which are the primary incidents of ownership; the right of indefinite

possession, which is an interest not necessarily co-extensive with legal title, and a quasi-property right of use. In the statutory scheme of arson, there is no indication of a legislative intent to limit the statutory prohibitions to destruction or impairment of interests emanating from legal title only. The term "proprietary interest," section 18-4-101(3), C.R.S. 1973 (1979 Supp.), is sufficiently broad to include a legally recognized security interest, such as that of the credit union, which the defendant had neither the right nor the authority to defeat or impair, even though he also had an interest in the secured property. Such construction comports with present day notions of security law, avoids hypertechnical results stemming from property concepts developed in a by-gone era, and furthers legislative intent in extending the protection of the arson statute to property rights as well as the traditional right of occupancy or possession.

*Id.* (citations omitted).

In another case, the Colorado Court of Appeals held, in the context of the civil theft statute that, "[i]f a person has parted with consideration entitling him to receive a thing of value, then he need not have obtained actual physical custody or delivery of the thing of value in order to have a proprietary interest in it." *People v. Ferguson*, 701 P.2d 72, 73 (Colo. App. 1984).

Here, the Kinetoplay Claimants parted with consideration entitling them to their bonuses – i.e., their intellectual property, know how, assets and first party data. NCM, however, through fraudulent accounting statements, declared that it owed them nothing. NCM's deception and unauthorized exercise of control over the bonuses is theft, pure and simple.

**58. In *Kelley*, the Supreme Court of Colorado overturned an embezzlement verdict because the parties' arrangement "was clearly such that the relationship between them was that of debtor and creditor." 402 P.2d at 935. In that case, an operator contracted with a company to sell the company's gas. *Id.* The company retained title in the gas until the gas entered the customers' cars. *Id.* The operator set retail prices and kept the difference between the retail price and the price he was to pay the company per gallon. *Id.* The court noted the importance of the fact that "the property alleged to have been embezzled here was not gasoline, the title to which remained in the Company until sale, but rather the money**

received by defendant for the gasoline." *Id.* It was also important to the court that the operator was not an agent or employee of the company, the operator ran the business independently from the company's oversight, the funds from the sale of gasoline were not held in trust for the company, and the company did not care how the operator generated the specific funds used to pay for the gasoline sales (for example, the operator could have paid the company with funds generated from sales of inside inventory). *Id.* For those reasons, "No money collected by [operator] in the operation of the station became the Company's property until it was actually transferred to the Company by [operator] in payment of his obligation. The arrangement between [operator] and the Company was clearly such that the relationship between them was that of debtor and creditor." *Id.*

      **ANSWER**: Denied. *Kelley,* which is nearly sixty years old, does not reference the current Colorado theft statute, and involves the sale of goods, in which the contract at issue set forth specifically when there was a transfer of interest. For the purposes of the current Colorado civil theft statute, C.R.S. § 18-4-401(1.5), "a thing of value is that of 'another' if anyone other than the defendant has a possessory or proprietary interest therein." Under this definition, "[i]f a person has parted with consideration entitling him to receive a thing of value, then he need not have obtained actual physical custody or delivery of the thing of value in order to have a proprietary interest in it." *People v. Ferguson*, 701 P.2d 72, 73 (Colo. App. 1984). Here, the Kinetoplay Claimants provided critical intellectual property, know how, services, first party data, and assets to NCM, and they thus had a proprietary interest in the earn-out bonuses in exchange for that consideration. NCM instead paid almost nothing for a multi-million dollar benefit. That is theft.

      **59. The present dispute is similar. NCM was not acting as an agent of the Claimants or Seller in interacting with NCM's clients.** *See* **Kenwick Declaration, ¶ 19. There is no**

provision in the Agreements that certain revenues were to be held in trust for the Claimants, or that any Performance Bonus earned was to be paid with revenues directly traceable to the digital gaming pillar. *See* Kenwick Declaration, ¶ 20. And the Claimants do not allege that NCM stole the actual digital gaming products (which NCM could not have stolen because NCM purchased those products through the APA).

**ANSWER:** Denied. After it received all that it was due under from the Kinetoplay Claimants, NCM attempted to walk out on the bill. As in *Ferguson*, this was theft, particularly when NCM provided fraudulent accounting statements to the Kinetoplay Claimants indicating that nothing was owed and NCM knew or should have known that it owed the Kinetoplay Claimants their maximum bonus.

60. In another analogous situation, the Colorado Supreme Court held that there was an agreement between a victim and the defendant's company to share rents on a motor home that the victim had purchased from the defendant's company. *People v. Treat*, 568 P.2d at 577. The court found there was "[n]o evidence [] that the [defendant's company] was an agent for the purpose of rental collections, or that specific rental funds were to be set aside for payment to [the victim]. [The victim's] only concern was that he be paid his share of the rents collected; no money collected by [defendant] became [the victim's] property until it was transferred by [defendant] in payment of the obligation. . . . This was simply a debtor-creditor controversy, properly to be resolved by civil proceedings." *Id.*

**ANSWER:** Denied. This case is not analogous and, if anything, supports the claims of the Kinetoplay Claimants. In *Treat*, the Colorado Supreme Court largely *allowed* the State to proceed with theft charges because the defendant was alleged to have done many of the same things as NCM here, i.e., retaining proceeds beyond what was initially authorized by contract, and then engaging in

deception to attempt to allay his victim. 568 P.2d at 475-78. The Colorado Supreme Court held that "even though initial control of the property has been authorized; the intent to deprive, or knowing use inconsistent with the owner's benefit, may arise at a later time when control is no longer authorized. At that time, the requisite elements of theft exist." *Id.* at 477. The *only* charge for which the Colorado Supreme Court affirmed dismissal involved one instance in which the defendant failed to pay rental allocations, but there was no evidence presented concerning his victim's possessory right to the proceeds or to deception by the defendant. *Id.* That limited portion of *Treat* is not relevant here and the Colorado state court found this analysis unavailing as well in denying the motion to dismiss.

**61. The same is true here. NCM collected its own revenues, not on behalf of the Claimants, and there were no specific revenues to be set aside for payment to the Claimants in the event the Performance Bonuses were earned. *See* Kenwick Declaration, ¶¶ 19–20. Thus, just as in *Treat*, this situation is at most a debtor-creditor controversy.**

**ANSWER:** Denied. This analysis misconstrues and misapplies *Treat*, which, if anything, supports the Kinetoplay Claimants.

**62. Alternatively, if the Court believes that this dispute is more than a debtor-creditor controversy, then the Claimants still have not shown and cannot show that NCM falsified the Accounting Statements, which, in addition to proving they had a proprietary interest in the Performance Bonuses, is necessary to succeed on their claims for civil theft: "(1) A person commits theft when he or she knowingly obtains, retains, or exercises control over anything of value of another without authorization or *by threat or deception*; . . . and: (a) Intends to deprive the other person permanently of the use or benefit of the thing of value . . . ." C.R.S. § 18-4-401 (emphasis added).**

**ANSWER:** Denied.  The deception element will not be difficult to prove, and the Kinetoplay Claimants look forward to obtaining discovery and presenting their claims at the hearing.

**63. For example, for a different theft count in *People v. Treat*, the court found that the requisite intent for theft could be inferred by the defendant's "use of the 'stall' to put [the victim] off until [the defendant] could leave the state, or from his payment with a worthless bank draft." 568 P.2d at 475. Here, the Claimants have not shown and cannot show that NCM knew that the Performance Bonuses were earned by the Claimants and yet still intended to deprive them of the Performance Bonuses permanently. *See* C.R.S. § 18-4-401; *see also* Kenwick Declaration, ¶ 26. ("The Performance Bonuses were not earned by Claimants under the terms of the Agreement. . . .").**

**ANSWER:** Denied. As said, the deception element will not be difficult to prove since members of NCM's senior management were well aware of the revenue allocations that were supposed to be applied to calculate the earn-out bonuses, but fastidiously refused to apply them and instead presented the Kinetoplay Claimants with fraudulent accounting statements.

**64. As stated above, NCM properly prepared the Accounting Statements in the ordinary course of business by using NCM's standard accounting procedures, and the information underlying the Accounting Statements was subject to NCM's accounting audit. *See supra* ¶¶ 42–43; *see also* Kenwick Declaration, ¶¶ 15–17. The Performance Bonuses were not earned by the Claimants under the terms of the Agreements. NCM communicated that conclusion to the Claimants and timely delivered the Accounting Statements. *See* Kenwick Declaration, ¶21.**

**ANSWER:** Denied. As stated above, NCM knew that its so-called "standard accounting procedures" were not to be applied in allocating the revenue for the purposes of calculating the

earn-out bonuses, and its attempt to invoke them is just further evidence of the deception it is attempting to perpetrate on the Kinetoplay Claimants and the Court. The Kinetoplay Claimants *and* NCM are *each* aware of revenue streams that were supposed to be allocated for bonus purposes, yet NCM deliberately left them out.

**65. The Claimants provide no relevant evidence to support their claims. Rather, they rely mostly on (1) pre-2020 NCM statements about digital products generally (which is a wider product suite than what qualifies for the Performance Bonuses); and (2) allegations of "personal knowledge that NCM has employed the Digital Gaming Products to generate revenue from specific large clients that is sufficient to satisfy the revenue thresholds . . . ."** *See* **Complaint, ¶ 61.**

**ANSWER:** Denied. The Kinetoplay Claimants have provided to the Court the information that is typically required for a proof of claim, and will provide proof sufficient to carry their burden at the hearing, following discovery. The evidence relating to these claims is largely in the hands of NCM, which not only controls the revenue information but also the Kinetoplay Claimants' contemporaneous documents from the time that they were employed by NCM.

The Kinetoplay Claimants are also hindered in providing further evidence and information because NCM has vigorously enforced the confidentiality provisions in the Employment Agreements and the Consulting Agreement. NCM would not even permit counsel for the Kinetoplay Claimants to review the Accounting Statements without first signing a non-disclosure agreement – another red flag of fraudulent intent. This posture continued in the Colorado state court, where NCM (over the Kinetoplay Claimants' objections) successfully suppressed the seven-year old contracts as purportedly containing confidential and trade secret information. In short, NCM has made clear that it will take aggressive action in the event that Kinetoplay Claimants make

anything other than general references in their pleadings. Having taken this position, NCM can hardly complain when the Kinetoplay Claimants have avoided making a public disclosure of the specific clients and revenue streams that they know should have counted toward the bonus, but that NCM deliberately withheld.

66. As shown *supra*, the Agreements provide for Performance Bonuses if revenue *directly generated from digital gaming products* exceeded certain high thresholds. The Claimants' references to NCM statements about digital products (no "gaming") are irrelevant, as those statements deal with digital products that are separate from—and more profitable than—those covered by the Employee Agreements and the Consulting Agreement. *See* Canning Declaration, ¶¶ 4, 8–11 (describing how "digital products" differ from products in the digital gaming pillar); Kenwick Declaration, ¶¶ 12–13 (providing revenue amounts showing that non-gaming digital products were more profitable than the digital gaming pillar).

ANSWER: Denied. As said above, NCM is deliberately omitting products that it knows were supposed to be included in the bonus calculation, such as revenue from advertising and sponsorship that incorporated Digital Gaming Products.

67. The Claimants similarly attempt to broaden their bases beyond "directly generated" revenue to claim all the value of "big screen + digital" advertising campaigns. Complaint, ¶¶ 59-60. However, digital sales are primarily driven by non-gaming digital products such as the Accelerator Digital Product, which NCM offers in "big screen + digital" campaigns in an effort to connect the advertisers with digitally engaged moviegoers before and after the movie experience. Canning Declaration, ¶ 9. Overall, NCM's core on-screen business is the primary draw for advertisers and drives sales of any secondary digital

products. Canning Declaration, ¶ 10. As part of its sales strategy, NCM pitches other products, such as the Accelerator Digital Product or a digital gaming product, to clients interested in on-screen advertising. Canning Declaration, ¶ 10. But despite NCM's efforts in marketing digital gaming products to NCM's customers, the digital gaming products have struggled to gain traction in the marketplace. *See* Canning Declaration, ¶ 11. In sum, NCM's on-screen advertising drives the sales of digital products or digital gaming products; The digital gaming pillar does not drive NCM's existing, core business. *See* Canning Declaration, ¶¶ 9–11.

**ANSWER:** Denied. This is a misstatement of how NCM employed the intellectual property, know-how, assets and data that it acquired from the Kinetoplay Claimants, and how the Kinetoplay Claimants were supposed to be compensated therefrom. As said, the Digital Gaming Products were integrated into numerous aspects of the business, including advertising and sponsorship campaigns, and would typically be custom made for each advertising and sponsorship deal. NCM knew that it was supposed to include revenue from those campaigns for bonus purposes, but deliberately chose not to.  As said above, the characterization of the "pillar" as an off-the-shelf store is also not remotely accurate; it refers to the overall digital strategy. This is "hollywood accounting" run amok.

**68. The Claimants' purported "personal knowledge" is similarly unavailing. Complaint, ¶ 61. That evidence can be reduced to say that NCM had contracts that involved the digital gaming pillar, and that those contracts were worth more than the thresholds needed to earn the Performance Bonuses. Again, the Claimants seek to capture value from all of NCM's sales—even that revenue from NCM's core on-screen business—regardless of how much revenue was actually generated by the digital gaming pillar.**

**ANSWER:** Denied. It appears that NCM is now *admitting* that it deliberately undercounted the revenue for bonus purposes by removing the revenue it received from "advertising" and "sponsorship" that was supposed to be counted towards the bonus. The Kinetoplay Claimants are aware of the campaigns on which they worked that integrated their Digital Gaming Products, the rough amount of revenue that NCM received from those campaigns, that these campaigns by themselves would have taken them over the bonus thresholds, and that NCM deliberately left them out of the calculation for that reason. The Kinetoplay Claimants reasonably believe that there are other, similar campaigns that should have counted towards the bonus, but that NCM deliberately withheld information about those campaigns as well. The Kinetoplay Claimants look forward to obtaining discovery and proving their claims at the hearing.

**69. The Accounting Statements undermine the Claimants' twisting of NCM's statements about digital products and the Claimants' assertions as to the few contracts that involved digital gaming products. In accordance with ASC 606 and NCM's standard accounting procedures, the Accounting Statements allocated revenue to the various digital gaming products for the relevant time periods. Kenwick Declaration, ¶ 17. All advertising revenue was depressed for this period as a result of the pandemic, and digital gaming revenue was no exception. *See* Kenwick Declaration, ¶¶ 6, 12.**

**ANSWER:** Denied. As said, the Accounting Statements were deceptive attempts to allow NCM keep the benefit of the Kinetoplay Acquisition without paying for it.

**70. Because they cannot prove a claim for civil theft under Colorado law, the Claimants have no grounds for treble damages or attorney fees. C.R.S. § 18-4-405; *see also Itin v. Ungar*, 17 P.3d 129, 134 (Colo. 2000) ("Only upon proof of the criminal act of theft may the owner recover treble damages, fees, and costs.").**

**ANSWER:** Denied. As said, the Kinetoplay Claimants will prove their claims at the hearing, following discovery.

**NCM Should Recover Attorney Fees**

**71. The APA, which is incorporated by the Employment Agreements and the Consulting Agreement, provides that "If any Legal Proceeding relating to this Agreement or the enforcement of any provision of this Agreement is brought against any party hereto, the prevailing party shall be entitled to recover reasonable attorneys' fees, costs and disbursements[.]" APA, § 11.2 ("Attorneys' Fees"). The Claimants themselves acknowledge that their claims relate to the**

**APA. Complaint, ¶¶ 5–8.**

**ANSWER:** Denied. The claim was initiated pursuant to the Employment Agreements and the Consulting Agreement, not the Asset Purchase Agreement. The parties to the Employment Agreements, Eric LaVanchy and Laurence Tobin, are not parties to the Asset Purchase Agreement. If the Court rules that this provision applies, however, then the Kinetoplay Claimants would also be entitled to their attorney fees and costs. Such fees and costs should be granted priority given the wrongful post-petition conduct of NCM in denying their claims.

**72. Regardless of the Claimants' acknowledgments, pursuant to merger clauses contained therein, the Consulting Agreement and Employment Agreements incorporate the terms of the APA—including its attorneys' fees provision. _See_ Consulting Agreement § 4.3.1 (referring to the "Asset Purchase Agreement"), § 13.6 ("This Agreement, together with any exhibits and documents referred to herein, constitutes the entire agreement of the parties with respect to the subject matter hereof and supersede any and all prior or contemporaneous agreements."); Employment Agreements § 3(c) (referring to the "Asset**

**Purchase Agreement"), § 12 ("This Agreement, those documents expressly referred to herein and other documents of even date herewith embody the complete agreement and understanding among the parties . . . .").**

      **ANSWER:** Denied. The Employment Agreements and the Consulting Agreement do not incorporate the attorney fee provision in the APA. If the Court rules that this provision applies, however, then the Kinetoplay Claimants would also be entitled to their attorney fees and costs. Such fees and costs should be granted priority given the wrongful post-petition conduct of NCM in denying their claims.

**RESERVATION OF RIGHTS**

      **73. NCM expressly reserves all rights related to this Objection, including, without limitation, the right to amend, modify, or supplement this Objection and/or raise any additional objections or arguments, prior to or during any hearing(s) regarding the claims, or any hearing regarding payment of any claims. NCM also reserves the right to object to any of the claims on any other grounds. All such rights are expressly reserved and preserved.**

      **ANSWER:** To the extent that an answer is required, the allegation is Denied.

**CONCLUSION**

      **WHEREFORE, NCM respectfully requests that this Court (i) disallow the Claims in their entirety, (ii) grant NCM attorney fees, and (iii) grant any further relief to which NCM may be justly entitled.**

      **ANSWER:** To the extent an answer to this allegation is required, it is denied.

      WHEREFORE, the Kinetoplay Claimants respectfully request the Court allow the claims in their entirety at the amount stated, including treble damages and attorney fees as permitted under the Colorado civil theft statute, and grant the Kinetoplay Claimants their attorney fees.

47

DATED this 23rd day of February, 2024.

Respectfully submitted,

FORTIS LAW PARTNERS LLC

<u>s/ David F. Olsky</u>
David F. Olsky, CO Atty. Reg. #46694
Fortis Law Partners LLC
1900 Wazee Street, Suite 300
Denver, CO 80202
Phone: (303) 295-9700
Fax: (303) 295-9701
dolsky@fortislawpartners.com

*Pro Hac Vice Attorney for Claimants' MB Kinetoplay, LLC, Eric Lavanchy, and Laurence Tobin*

## CERTIFICATE OF SERVICE

I hereby certify that on February 23, 2024, I electronically filed the foregoing **RESPONSE OF MB KINETOPLAY, LLC, ERIC LAVANCHY, AND LAURENCE TOBIN TO REORGANIZED DEBTOR'S OBJECTION TO CLAIM NOS. 67, 68 & 69** with the Clerk of the Court using the CM/ECF system.


*s/ Anastasiya Karant*
Anastasiya Karant

49