United States Bankruptcy Court
Southern District of Texas

**ENTERED**

January 14, 2025

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO: 23-90291 |
| NATIONAL CINEMEDIA, LLC, | § | |
| | § | |
| Debtor. | § | |
| | § | |
| | § | CHAPTER 11 |

### MEMORANDUM OPINION

This matter concerns a breach of contract dispute between National CineMedia, LLC ("NCM"), and the founders of Kinetoplay, LLC and MC Kinetoplay ("Claimants"). As part of NCM's acquisition of Kinetoplay in 2017, the Claimants entered into employment and consulting agreements with NCM. Each agreement contains a provision providing for a performance-based bonus if a certain revenue threshold is met. The parties dispute the interpretation of the provision. The Claimants assert that they were entitled to the performance-based bonuses and that NCM wrongfully denied it to them. NCM asserts that the Claimants failed to meet the revenue threshold.

Both parties filed cross-motions for partial summary judgment. The Claimants seek summary judgment allowing their claims with the amounts to be determined at trial. NCM seeks summary judgment interpreting the performance-based bonus provision.

For the reasons stated below, Claimants' partial motion for summary judgment is denied; NCM's partial motion for summary judgment is granted.

### BACKGROUND

NCM's primary business is selling on-screen advertising in movie theatres nationwide. Kinetoplay developed online and mobile applications of cinema-related entertainment gaming. NCM acquired

Kinetoplay to expand NCM's on-screen advertising business into the digital realm.

## I.   FACTUAL HISTORY

On May 16, 2017, NCM entered into an Asset Purchase Agreement (APA) with Kinetoplay, Inc. for the purchase of Kinetoplay's assets in the "Business."   ECF No. 709 at 4.   The APA's disclosure schedule identifies "Fantasy Movie League" as Kinetoplay's product. ECF No. 709 at 4.   The APA defines "Business" as "the business of creating and developing, commercializing and managing online/mobile application of movie and cinema-related entertainment gaming and content business for consumer engagement and use."   ECF No. 709-2 at 1.

On the same date, NCM and Kinetoplay signed a "Side Letter", which provides for promoting and marketing NCM's digital games through funding the post-acquisition Business.   ECF No. 709 at 5.   By the terms of the Side Letter, NCM would promote, market, and fund the operation of the "digital gaming pillar"[1] by contributing $30,000,000 worth of media value, and $2.1 million in cash and qualified expenses. ECF No. 709 at 5.

On July 14, 2017, NCM entered into (i) employment agreements with Kinetoplay's founders, Eric LaVanchy and Laurence Tobin; and (ii) a consulting agreement with MB Kinetoplay.   ECF No. 712 at 13.   The consulting and employment agreements provided for "Business Performance Bonus" provisions, which contain virtually identical language.   The only difference is that the potential bonus amount under the consulting agreement is larger than that under the employment agreements.   ECF No. 709 at 7.   The bonus provision provides:

> In the event that the Business (as defined in the Asset
> Purchase Agreement, dated May 16, 2017, among the

---

[1]   NCM defines the digital gaming pillar as an initiative to provide digital gaming products for consumers to play on stand-alone websites or phone applications outside of the movie theatre.   ECF No. 709 at 14.

Company, Kinetoplay Inc. and the Shareholders (as defined therein)) achieves Five Million Dollars ($5,000,000) in revenue directly generated by the Business's digital gaming products in the Company's digital gaming pillar through advertising, sponsorship, tournaments, virtual goods and merchandise directly purchased from the Company's digital gaming pillar from the Company's website or revenue share generated through the purchase from an affiliate of the Company or partner site of the Company, and others as mutually agreed upon by the Company and the Employee[/Consultant (collectively "Digital Gaming Revenue") in the twelve (12) months prior to the third (3rd) anniversary of the date hereof (the "Third Year Revenue"), the Company shall pay [the Third Year Bonus.] In the event that the Business achieves Seven Million Five Hundred Thousand Dollars ($7,500,000) in Digital Gaming Revenue in the twelve (12) months prior to the fourth (4th) anniversary of the date hereof (the "Fourth Year Revenue"), the Company shall pay [the Fourth Year Bonus.]

ECF No. 709-5 at 2. The Claimants were paid a yearly salary but allege that the bonus was the "primary consideration" for their services. ECF No. 712 at 2.

Upon the expiration of the bonus periods, NCM calculated and allocated the revenues attributable to NCM's digital products and non-digital products in accordance with Generally Accepted Accounting Principles. ECF Nos. 709-4 at 5; 709 at 16. NCM credited the Bonus Calculation whenever revenue was generated by advertising impressions delivered on the digital gaming products themselves through the digital gaming pillar. ECF No. 709-4 at 6. For integrated deals involving both an onscreen and digital component, NCM credited the Claimants revenue for the portions of contracts earmarked from digital gaming products in the digital gaming pillar. ECF No. 709-4 at 6. When the contract was silent on what portion was driven by the onscreen or digital component, NCM credited the Claimants half of the total contract revenue. ECF No. 709-4 at 6.

NCM alleges that Digital Gaming Revenue, as defined in the Bonus Provision, failed to meet the $5 million threshold amount to warrant performance bonuses for the first bonus period. ECF No. 709 at 16. Business Performance Bonuses were not awarded to the Claimants. ECF No. 709 at 16.

On May 13, 2022, the Claimants filed suit against NCM in Colorado state court, alleging claims of breach of contract and implied duty of good faith and fair dealing, civil theft, and violation of the Colorado Wage Claim Act. ECF No. 709 at 18. The suit forms the basis of the claims at issue.

## II.   PROCEDURAL BACKGROUND

On April 11, 2023, NCM voluntarily commenced its chapter 11 bankruptcy case. ECF No. 709 at 18.

On May 30, 2023, the Claimants filed Proofs of Claim Nos. 67, 68, and 69. ECF No. 709 at 18–19. Eric LaVanchy and Laurence Tobin each asserted general unsecured claims in the amount of $3,133,075 for breach of contract and civil theft. ECF No. 709 at 18–19. MB Kinetoplay asserted $15,108,000. ECF No. 709 at 19.

On January 3, 2024, NCM filed its *Objection to Claim Nos. 67, 68 & 69 Filed by MB Kinetoplay, LLC, Eric LaVanchy, and Laurence Tobin*. ECF No. 615. On February 23, 2024, the Claimants filed their response. ECF No. 640.

On July 15, 2024, NCM filed amended objections to the claims. ECF Nos. 667, 669 & 670. On August 23, 2024, each Claimant filed a response to the amended objections. ECF No. 694, 696 & 697.

On September 20, 2024, NCM filed its *Partial Motion for Summary Judgment Related to Objections to Claim Nos. 67, 68, & 69 Filed by MB Kinetoplay, LLC, Eric LaVanchy, and Laurence Tobin*. ECF No. 709. On the same day, the Claimants filed their *Motion for Partial Summary Judgment Allowing Their Claims*. ECF No. 712.

On October 11, 2024, NCM filed its response to Claimants' motion for partial summary judgment. ECF No. 722. The Claimants filed their response to NCM's partial motion for summary judgment on the same day. ECF No. 725.

On October 20, 2024, NCM filed its reply in support of its partial motion for summary judgment. ECF No. 731. On October 21, 2024, the Claimants filed their reply brief in support of its motion for partial summary judgment. ECF No. 732.

On October 22, 2024, the Court held a hearing on the motions for summary judgment. ECF No. 736. The Court took the matter under advisement on the same day.

## JURISDICTION

The District Court has jurisdiction over this proceeding under 28 U.S.C. § 1334(a). Venue is proper in this District pursuant to 28 U.S.C. § 1409. This is a core proceeding under 28 U.S.C. § 157(b)(2). The dispute has been referred to the Bankruptcy Court under General Order 2012-6.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute of material fact means that evidence is such that a reasonable fact finder "could return a verdict for the nonmoving party." *Gorman v. Verizon Wireless Tex., L.L.C.*, 753 F.3d 165, 170 (5th Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). It is the movant's burden to establish that no genuine issue of material fact exists. *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (citing *Condrey v. SunTrust Bank of Ga.,* 429 F.3d 556, 562 (5th Cir. 2005)). A party asserting that a fact cannot be or is not genuinely disputed must support that assertion by citing to particular parts of materials in the record, showing that the materials

cited do not establish the absence or presence of a genuine dispute, or showing that an adverse party cannot produce admissible evidence to support that fact. FED. R. CIV. P. 56(c)(1). If the movant establishes "the absence of evidence supporting an essential element of the non-movant's case," the burden shifts to the non-movant to establish a genuine dispute of material fact. *Sossamon*, 560 F.3d at 326 (citing *Condrey*, 429 F.3d at 562).

In cases involving the interpretation of a contract, summary judgment is only appropriate where the language of the contract is unambiguous. *See Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1192 (2d Cir. 1996); *Cooper Indus., LLC v. Precision Castparts Corp.*, 2016 WL 4939565, at \*6 (S.D. Tex. Sept. 14, 2016). "In the context of contract interpretation, only when there is a choice of reasonable interpretations of the contract is there a material fact issue concerning the parties' intent that would preclude summary judgment." *Gonzalez v. Denning*, 394 F.3d 388, 392 (5th Cir. 2004) (citing *Amoco Prod. Co. v. Texas Meridian Res. Exploration, Inc.*, 180 F.3d 664, 669 (5th Cir. 1999).

In ruling on a motion for summary judgment, a court should view the facts and evidence in light most favorable to the non-moving party. *Plumhoff v. Rickard*, 572 U.S. 765, 768 (2014). Nevertheless, the court is not obligated to search the record for the non-moving party's evidence. *Keen v. Miller Env't Grp., Inc.*, 702 F.3d 239, 249 (5th Cir. 2012). "Summary judgment may not be thwarted by conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence." *Hemphill v. State Farm Mut. Auto. Ins. Co.*, 805 F.3d 535, 538 (5th Cir. 2015). The Court need only consider the cited materials, but it may consider other materials in the record. FED. R. CIV. P. 56(c)(3). The Court should not weigh the evidence. *Aubrey v. Sch. Bd. of Lafayette Par.*, 92 F.3d 316, 318 (5th Cir. 1996). A credibility determination may not be part of the summary judgment analysis. *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014).

## DISCUSSION

The employment and consulting agreements are governed by Colorado law. ECF Nos. 709-5, 709-6 & 709-7. Under Colorado law, the primary goal of contract interpretation is to determine the intent of the parties. *Ad Two, Inc. v. City & County of Denver ex rel. Manager of Aviation*, 9 P.3d 373, 376 (Colo. 2000). Intent is determined primarily from the four corners of the agreement, and the agreement's language is construed with the plain and generally accepted meaning of the words. *See id.* Unambiguous contracts are enforced according to their plain language. *See id.* Extraneous evidence is only allowed to prove a contrary intent when there is ambiguity in the contract or when the contract's terms are "used in some special or technical sense not apparent from the contractual document itself." *Id.* ("Terms used in a contract are ambiguous when they are susceptible to more than one reasonable interpretation."); *Travelers Indem. Co. v. Howard Elec. Co.*, 879 P.2d 431, 434–35 (Colo. App. 1994). The mere fact that the parties may have different opinions regarding the interpretation of the contract does not itself create an ambiguity in the contract. *City & Cnty. of Denver*, 9 P.3d at 377.

A court may consider extrinsic evidence to determine whether a contract is ambiguous. *See East Ridge of Fort Collins, LLC v. Larimer & Weld. Irr. Co.*, 109 P.3d 969, 974 (Colo. 2005); *Cheyenne Mountain Sch. Dist. No. 12 v. Thompson*, 861 P.2d 711, 715 (Colo. 1993). However, "the court may not consider the parties' own extrinsic impressions of intent." *Cheyenne Mountain Sch.*, 109 P.3d at 716.

## I. THE BUSINESS PERFORMANCE BONUS PROVISION IS UNAMBIGUOUS.

The Court must determine whether the Bonus Provision is ambiguous. The parties each allege that the Bonus Provision is unambiguous but offer disputing interpretations of what encompasses "Digital Gaming Revenue" for entitlement of the performance-based

bonuses.  ECF No. 709 at 21.  The relevant provision in the employment and consulting agreements provide:

> In the event that the Business (as defined in the Asset Purchase Agreement, dated May 16, 2017, among the Company, Kinetoplay Inc. and the Shareholders (as defined therein)) achieves Five Million Dollars ($5,000,000) in revenue **directly generated** by the **Business's digital gaming products** in the **Company's digital gaming pillar** through **advertising, sponsorship, tournaments, virtual goods and merchandise** directly purchased from the Company's digital gaming pillar from the Company's website or revenue share generated through the purchase from an affiliate of the Company or partner site of the Company, **and others as mutually agreed upon** by the Company and the Employee[/Consultant] (collectively "Digital Gaming Revenue") in the twelve (12) months prior to the third (3rd) anniversary of the date hereof (the "Third Year Revenue"), the Company shall pay [the Third Year Bonus.] In the event that the Business achieves Seven Million Five Hundred Thousand Dollars ($7,500,000) in Digital Gaming Revenue in the twelve (12) months prior to the fourth (4th) anniversary of the date hereof (the "Fourth Year Revenue"), the Company shall pay [the Fourth Year Bonus.]

ECF No. 709-5 at 2 (emphasis added).  Looking at the Bonus Provision's plain language, the Court finds that Digital Gaming Revenue:

- Must achieve $5,000,000 for the third year's bonus to be awarded.

- Must be *directly generated* by the Business's digital gaming products in the Company's digital gaming pillar.

- Must be *directly generated* through:

  o advertising,

  o sponsorships,

- o tournaments,

- o virtual goods and merchandise directly purchased from the Company's digital gaming pillar from the Company's website, or revenue share generated through purchase from the affiliate of the Company or partner site of the Company, and

- o others as mutually agreed upon by the parties.

The parties disagree on the definition of "Digital Gaming Revenue". One of the principal disputes is whether revenue generated outside of the digital gaming pillar should be credited to the bonus calculation.

Although the Provision is complex, the Court sees no ambiguity. Revenue generated outside of the digital gaming pillar does not count as Digital Gaming Revenue even if it is derived from a "digital gaming product."

NCM defines the digital gaming pillar as a source of revenue separate from NCM's on-screen advertising, lobby advertising ("LEN")[2], and "Digital Out of Home" ("DOOH")[3] businesses. ECF No. 709-1 at 5.

The digital gaming pillar provided digital gaming products (e.g., Fantasy Movie League, Noovie Arcade, Noovie Trivia, Noovie Shuffle, and Name that Movie) for consumers to play on websites or phone applications. ECF No. 709-1 at 5. While NCM's on-screen business operated at a business-to-business level, the digital gaming pillar

---

[2] NCM's "Lobby Entertainment Network" involves running advertising on screens in the lobbies of movie theaters. ECF No. 709 at 9.

[3] NCM's "Digital Out-of-Home" service sold advertisements for display on third-party devices or on screens in restaurants, in office buildings, on ATMs, and on college campuses. ECF No. 709 at 12. NCM promoted its digital games by displaying digital gaming advertising, but digital games could not be played on that platform. ECF No. 709 at 12–13.

developed consumer-facing products that consumers interact with online or on phone applications.  ECF No. 709-1 at 5.

It is undisputed that on-screen revenue is not revenue in the digital gaming pillar.  Although the Claimants dispute the relevance of whether the revenue was earned within the digital gaming pillar, they do not dispute the definition itself.  The Court adopts the undisputed definition provided by NCM.

The relevance issue is apparent.  The contract only includes revenue earned in the digital gaming pillar.  It does not include other revenue that is generated outside of the digital gaming pillar even when it is related to digital gaming products.  This excludes revenue generated by on-screen, LEN, and DOOH advertising, regardless of its relationship to the digital gaming product.

The Claimants attempt to argue that the Court should disregard the phrase "in the Company's digital gaming pillar."  There are several problems with that.  First, the Claimants are attempting to create an ambiguity when none exists.  Second, the Court should give meaning to all the terms in the agreement.  *See U.S. Fidelity & Guar. Co. v. Budget Rent-A-Car Systems, Inc.*, 842 P.2d 208, 213 (Colo. 1992) ("Each *word* in an instrument is to be given meaning if at all possible.").

If the Court gives no meaning to the phrase "in the Company's digital gaming pillar", the Provision would read:

> In the event that the Business (as defined in the Asset Purchase Agreement, dated May 16, 2017, among the Company, Kinetoplay Inc. and the Shareholders (as defined therein)) achieves Five Million Dollars ($5,000,000) in revenue directly generated by the Business's digital gaming products through advertising, sponsorship, tournaments, virtual goods and merchandise . . . .

This exclusion would violate one of the first principles of contract interpretation because it would exclude words from the sentence and

give the Provision a wholly different meaning.  The Court declines to ignore certain words when the Provision itself is unambiguous.

The phrase "in the Company's digital gaming pillar" also determines when revenue is "directly generated."  *See Bledsoe Land Co. LLLP v. Forest Oil Corp.*, 277 P.3d 838, 846 (Colo. App. 2011) ("it is paramount in contract interpretation that we read a contract's terms in harmony . . . .").  The Provision requires that revenue from digital gaming products in the digital gaming pillar must be *directly* generated. *See Directly*, BLACK'S LAW DICTIONARY (7th ed. 1999) ("1. In a straightforward manner.  2. In a straight line or course.  3. Immediately.").  Based on the record, digital gaming products can theoretically generate revenue in different ways:

- Advertisers can have their brand displayed on the consumer-facing Digital Gaming Product;

- Advertisers can integrate their brand in a Digital Gaming Product, so the consumer can see the advisement when playing the game or when they see a promotion of the game on a movie screen;

- Advertisers can package their online sponsorship of a digital game with an on-screen sponsorship;

- Advertisers can integrate their brand into "advergames" which are digital games that allow consumers to interact with the advertiser's brand during gameplay;

- Companies monetize first party data generated by Digital Gaming Products through data sales and tracking consumer behavior.

ECF No. 712 at 7–8.  The question is which of the above *directly* generates revenue as contemplated by the parties in the Bonus Provision.  By the plain meaning of the term "directly," Digital Gaming Revenue must have an immediate connection to the digital games products in the digital gaming pillar.   The revenue cannot be a

secondary or ancillary result of the digital gaming products. Revenue merely related to digital gaming products is not revenue *directly* generated by digital gaming products when that revenue is earned outside of the digital gaming pillar. Claimants do not get credit for on-screen, lobby, and DOOH advertising even if coupled with advertising on the digital game itself. Claimants also do not get credit for the monetization of first party data derived from digital gaming products through Cinema Accelerator.[4]

The Claimants argue that the provision can include revenue streams beyond the ones enumerated (e.g., advertising, sponsorship, tournaments, virtual goods and merchandise, and revenue share). The provision provides that revenue streams can include "others as mutually agreed upon by the Company and the Employee[/Consultant]."

The Claimants' argument does not preclude NCM's partial summary judgment. The record does not provide evidence of any "mutual agreement" as required by the Provision. Expressions of intent, without more, are not sufficient evidence of "mutual" agreements. The Claimants allege that there were pre-signing discussions that created this obligation.

The Claimants would have the Court ignore the requirement for a post-execution mutual agreement. The employment/consulting agreements contain merger clauses which provide:

> <u>Complete Agreement.</u> This Agreement, those documents expressly referred to herein and other documents of even date herewith embody the complete agreement and understanding among the parties and supersede and preempt any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way.

---

[4] *See* discussion *infra* Section II.

ECF Nos. 709-5, 709-6, 709-7.  The merger clause precludes any pre-acquisition mutual agreements from being enforceable.  While the clause may leave open the possibility of post-acquisition mutual agreements, there is no evidence of any agreements supplementing the revenue streams as those expressly mentioned in the provision.

The Court finds that the Bonus Provision is unambiguous in defining Digital Gaming Revenue.  As requested by NCM and consistent with the Provision's plain language, the Court makes the following findings as a matter of law:

- Consumer data is not among the Business' digital gaming products as that phrase is used in the definition of Digital Gaming Revenue in the Service Agreements;

- Revenue attributable to the use or sale of consumer data is not Digital Gaming Revenue as that term is defined in the Service Agreements;

- Claimants are not entitled to credit in the Bonus Calculation for all Cinema Accelerator revenue during the Performance Periods simply because consumer data from the Business' digital games was ingested into NCM's data management platform.  Claimants are only entitled to credit for revenue generated from impressions in the digital games themselves;

- Cinema Accelerator revenue is not in the digital gaming pillar, and revenue attributable to Cinema Accelerator is therefore not Digital Gaming Revenue as that term is defined in the Service Agreements unless the ads were run on the actual digital gaming platforms;

- Revenue attributable to on-screen advertising is not Digital Gaming Revenue as that term is defined in the Service Agreements;

- Claimants are not entitled to credit in the Bonus Calculation for on-screen revenue during Performance Periods;

- The entire value of any integrated contract is not a Digital Gaming Revenue as that term is defined in the Service Agreements;

- Claimants are not entitled to credit in the Bonus Calculation for the entire value of integrated contracts during the Performance Periods;

- DOOH Service revenue is not a Digital Gaming Revenue as that term is defined in the Service Agreements;

- Claimants are not entitled to credit in the Bonus Calculation for DOOH Service revenue during Performance Periods;

- LEN revenue is not a Digital Gaming Revenue as that term is defined in the Service Agreements;

- Claimants are not entitled to credit in the Bonus Calculation for LEN revenue during the Performance Period;

- Advertising revenue that was not associated with the digital gaming products themselves is not Digital Gaming Revenue as that term is defined in the Service Agreements; and

- Claimants are not entitled to credit in the Bonus Calculation for advertising revenue that was not associated with digital gaming products themselves during the Performance Periods.

## II.   ALLOWANCE OF CLAIMANT'S CLAIMS IS AN ISSUE OF MATERIAL FACT RESERVED FOR TRIAL.

The Claimants seek partial summary judgment for allowance of their claims, with the amount of the claims to be determined at trial. ECF No. 712 at 1. The claims are premised on the assumptions that Digital Gaming Revenue met the threshold amount of $5,000,000 and that NCM wrongfully withheld the bonuses.

The Claimant's basis for allowing the claims on summary judgment is that State Farm provided for a $5.1 million sponsorship of "Name That Movie."   ECF No. 741 at 6.   "Name That Movie" is undisputedly a digital gaming product in the digital gaming pillar.  The sponsorship included both a digital product  through the digital gaming pillar and an on-screen component  NOT through the digital gaming pillar.   The State Farm Contract allegedly earmarked $200,000 to digital gaming component and credited the amount to the Bonus Calculations.

ONLINE/MOBILE
1810-01970
**Noovie Name that Movie Digital Sponsorship (was Cinema Accelerator Cross Platform Video and Banners)**
7/26-8/29 and 11/29-12/26
Net Total: $200,000.00

Total Digital: $200,000.00

ECF No. 723-19 at 4.

The Claimants instead contend that all $5.1 million of the "Name That Movie" sponsorship should have been credited.  In a similar vein, the Claimants seek credit towards Bonus Calculations for all revenue from integrated deals.  Integrated deals offer both a component through the digital gaming pillar and an on-screen component (not part of the digital gaming pillar) to advertisers.  ECF No. 712 at 39.  The Claimants rely on NCM's public statements touting that Digital Gaming Products were "helping to drive [NCM's] core high-margin on screen ad business." ECF No. 712 at 5.

The Court cannot rely on these statements because the provision is unambiguous.  Even if the Court does consider this evidence, the statements do not move the needle.  At best, the statements show that digital gaming products provided ancillary benefits to NCM's legacy business.  That benefit—while it may exist—does not influence the measure of revenue in the Bonus Calculation, which requires revenue from digital gaming products in the digital gaming pillar.  The "Name That Movie" sponsorship certainly generated some Digital Gaming Revenue, as defined in the Bonus Provision, but it also generated

revenue through on-screen advertisements, outside of the digital gaming pillar. The Claimants should receive credit for revenue within the digital gaming pillar, but not revenue from outside of it.

Next, the Claimants allege that they are entitled to be credited towards the Bonus Calculations for all revenue generated from Cinema Accelerator, which generated $8 million the year before the Kinetoplay acquisition. ECF No. 709 at 12. Cinema Accelerator is a digital advertising platform that allows NCM's clients to target audiences with consumer-specific advertising. ECF No. 709 at 10. It is not a digital gaming product in the digital gaming pillar. Cinema Accelerator ingested a certain amount of a first-party consumer data derived from digital gaming products. ECF No. 712 at 4–5. On that basis, the Claimants allege that Cinema Accelerator revenue should have been credited in the Bonus Calculations.

This argument is not convincing. Nothing in the Bonus Provision contemplates or references revenue earned outside of the digital pillar. The link between first party data from digital gaming products and revenue from Cinema Accelerator is far too attenuated to establish that digital gaming products directly generated revenue. It would be extraordinary that in an acquisition transaction, the Claimants would be credited towards performance-based bonuses in separate agreements for the Company's use of their data from products it acquired. Further, Cinema Accelerator preexisted the Kinetoplay acquisition and generated $8 million the year before the agreements. ECF No. 709 at 12. The Claimants' assertion that their bonus calculations would capture pre-acquisition revenue from a non-digital gaming product has no basis.

The Claimants' allegation that the parties intended for all Cinema Accelerator revenue to be included in the calculation based on internal communications, public statements, representations to clients, and corporate documents emphasizing the importance of first party data from the digital games is also unavailing because the provision is unambiguous.

Whether NCM properly calculated Digital Gaming Revenue in accordance with the unambiguous Bonus Provision is an issue of fact for trial. Prior to a hearing on this factual issue, the Court cannot allow these claims.

The Claimants' procedural argument for allowing the claims at the summary judgment stage also fails. They assert that NCM failed to timely object to their proof of claims and therefore, the claims should be allowed under § 502(a). On January 3, 2024, NCM filed an omnibus objection to the claims before the February 2, 2024 deadline to file proof of claims. ECF No. 615. The Claimants allege that the omnibus objection was improper because it failed to comply with Rule 3007. ECF No. 712 at 34. On July 15, 2024, NCM filed amended objections to each proof of claim. ECF Nos. 667, 669, 670. The Claimants allege that the amended objections were untimely and failed to relate back to the timely omnibus objection. ECF No. 712 at 35.

The Court's scheduling order entered on June 5, 2024 allowed pleadings to be amended by July 15, 2024. ECF No. 657 at 2. The amended objections were timely. Even if untimely, amended objections relate back if they do not present materially different objections. *See In re Eden*, 141 B.R. 121, 123 (W.D. Tex. 1992) (ruling that an amended objection relates back to the timely objection as long as the "amended objection does not attempt to present a totally new objection to the claim").

Here, the amended objections are substantively similar to the original omnibus objection because they challenge the same conduct and transaction.

The Claimant's motion for summary judgment is denied. The allowance of the claims will be determined at trial.

### III.   THE CLAIMS FOR CIVIL THEFT AND TREBLE DAMAGES ARE DISALLOWED.

NCM seeks summary judgment denying the civil theft claim and treble damages as a matter of law.  To recover for civil theft under Colorado law, the plaintiff must show that a defendant (1) knowingly obtained, retained or exercised control over anything of value or another without authorization or by threat or deception, and (2) intended to deprive the other person permanently of the use or benefit of the thing of value.  COLO. REV. STAT. § 18-4-401 (2022).

NCM asserts that a mere breach of contract does not impose civil theft liability because "a dispute between a debtor and creditor over money owed does not constitute theft."  ECF No. 709 at 33; *see Tisch v. Tisch*, 439 P.3d 89 (Colo. App. 2019).  However, the existence of a contract does not preclude a claim for civil theft.  *Million v. Grasse*, 549 P.3d 1043, 1051 (Colo. App. 2024).  A contractual obligation to pay money can constitute a civil theft claim if the plaintiff has a proprietary interest in the money.  *Id.* at 1051–52 (noting that a contractual right or expectancy in the money is insufficient for a civil theft claim.). To have a proprietary interest in the money, "there must be either a specifically identifiable account or a wrongful obtaining, retention, or exercise of control over specifically identifiable funds that belong to the plaintiff." *Id.* at 1051.

*Million* held that a plaintiff did not have a sufficient proprietary interest in money because the settlement agreement, which provided for a formula for determining the amount owed to the plaintiff on the sale of real property, did not identify a specific amount of money payable to the plaintiff.  *Id.* at 1052.  There was no identifiable escrow account or trust that held the sale proceeds for the plaintiff.  *Id.*; *cf. Rhino Fund, LLLP v. Hutchins*, 215 P.3d 1196, 1195 (Colo. App. 2008) (ruling a civil theft claim successful because there was an agreement that required sale proceeds to be placed in an escrow account, which established specifically identifiable funds).  Further, it was unclear whether the plaintiff was owed any distribution.  *See Million*, 549 P.3d at 1052.

Under the facts of this case, there was no trust or escrow account holding the Claimants' interest in the bonuses. The Claimants' interests were also contingent on meeting performance-based metrics; there was never a guarantee that bonuses were going to be awarded to them. The Claimants seem to think otherwise. Citing *People v Ferguson*, the Claimants argue that they have a proprietary interest in the bonuses because they parted with consideration in the form of intellectual property, know how, assets and first party data. ECF No. 725 at 90; 701 P.2d 72, 73 (Colo. App. 1984) ("If a person has parted with consideration entitling him to receive a thing of value, then he need not have obtained actual physical custody or delivery of the thing of value in order to have a proprietary interest in it."). The Claimants appear to construe the acquisition of Kinetoplay as consideration for the payout of the bonuses. This is simply not supported by the plain language of the Bonus Provision, which requires NCM to award bonuses if Digital Gaming Revenue meets $5 million. While the Claimants allege that the bonuses were the primary consideration, nothing in the contract contemplates awarding the Claimants bonuses for the acquisition of Kinetoplay. The Claimants' interests in the bonuses are contractual rights or expectancy in nature.

To be sure, the Colorado District Court held that the Claimants sufficiently stated a proprietary interest in the bonus payments at the dismissal stage in the pending state court action. ECF No. 712-1 at 9–10. The Claimants urge that the Court "should not reach a different conclusion." ECF No. 725 at 90. The Colorado state court's holding is not controlling here. While the civil theft claim under Colorado law survived dismissal, the question at this summary judgment stage is whether there is any genuine dispute of material fact under federal law. NCM provided evidence that the Claimants did not have a sufficient proprietary interest in the bonus payments because the bonus payments were not required to be held in trust and to be paid with revenue traceable to digital gaming products. ECF No. 709-4 at 7. The Claimants have not provided sufficient evidence rebut that evidence. There is a difference between a dismissal for failure to state a claim

under Colorado state pleading standards and a dismissal for failure to produce evidence to support a claim at the summary judgment stage under federal law.

NCM argues that the Claimants cannot prove that NCM falsified the accounting statements with the requisite intent for civil theft of the bonuses.  ECF No. 709 at 35.  NCM alleges that it determined that the performances bonus threshold was not met after preparing the accounting statements by using standard accounting procedures consistent with the Agreements.  ECF No. 709 at 36.  The Claimants do not contest this but instead allege that NCM deliberately and wrongfully excluded certain revenue streams.  ECF No. 712 at 5.  Claimants' bare allegations do not automatically create a genuine issue of material fact. The Claimants provide no evidence that NCM falsified the accounting statements with the requisite intent to deprive the Claimants of their bonuses.  The record does show that digital gaming products provided intangible benefits not captured by the Bonus Provision.  But there is an absence of any evidence that NCM knew Digital Gaming Revenue included a broader scope of revenue streams and wrongfully excluded revenue in the bonus calculations.

The civil theft claim seeking punitive damages fails as a matter of law.

## CONCLUSION

A separate order will be entered.


SIGNED 01/14/2025

Marvin Isgur
United States Bankruptcy Judge